IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

────────────────────

TERRENCE TAYLOR,

                    Plaintiff,

                                        Civil Action. No.
        v.                              9:09-CV-1036 (FJS/DEP)

DR. PANG L. KOOI; DR. J. DOLAN; NANCY
RYERSON; J. BARETTE, and
DR. GRACEFFO,

                    Defendants.

────────────────────

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

TERRENCE TAYLOR, *Pro Se*
87-A-1749
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          MICHAEL G. McCARTIN, ESQ.
Attorney General                   Assistant Attorney General
State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Terrence Taylor, a New York State prison inmate, commenced this action pursuant to 42 U.S.C. § 1983 in September 2009 against various employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), complaining of the deprivation of his civil rights during the period of his confinement.  In his complaint, as amended, plaintiff claims principally that his reports of excruciating hip pain to prison medical personnel between 2000 and 2006 were largely ignored, and that during that period he was denied adequate medical treatment and pain medication.  Plaintiff maintains that by their conduct the defendants were deliberately indifferent to his serious medical needs, thus violating the Eighth Amendment to the United States Constitution.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's remaining medical indifference claims against them, both on the merits and on the basis of qualified immunity.  For the reasons set forth below, I conclude that no reasonable factfinder could find that defendants were subjectively indifferent to plaintiff's serious medical needs and therefore recommend that defendants' motion be granted.

2

I.      BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the

DOCCS.  *See generally* Second Amended Complaint (Dkt. No. 48);

Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 60) ¶ 1.  At the times

relevant to his claims, plaintiff was confined at the Auburn Correctional

Facility ("Auburn"), located in Auburn, New York.  Second Amended

Complaint (Dkt. No. 48) § II(A).

Shortly after his transfer into Auburn in January 2000, plaintiff

began complaining to medical personnel of pain in his hip and femur, an

area which had undergone surgical repair in March 1994 as a result of a

gunshot wound, requesting pain medication and a referral to an outside

orthopedic specialist.[2]  Second Amended Complaint (Dkt. No. 48)

Attachment ¶ 3.  As a result of his complaints, plaintiff's hip condition was

---

[1]      In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]      Defendants vigorously dispute that plaintiff experienced hip pain over the entire period between 2000 and 2006.  In support of their position they point to an August 18, 2006 report from Dr. Mitchell Rubinovich, an outside orthopedic specialist, in which he wrote that according to the plaintiff, "[o]ver the past 4 months, he has developed severe pain in the right hip, . . .."  *See* McCartin Decl. (Dkt. No. 56-2), Dep. Exh. 16.  Because at this procedural juncture all inferences must be drawn and ambiguities resolved in a light most favorable to the plaintiff, notwithstanding that report I have assumed that plaintiff's complaints of hip pain persisted from 2000 until his surgery in 2006, as he alleges.

monitored over time by prison medical personnel.  McCartin Decl. (Dkt.

No. 56-2) Exh. A (transcript of plaintiff's deposition, conducted on May 24,

2011, and hereinafter cited as "Dep. Tr. pp. __") at pp. 29, 72.  According

to plaintiff, approximately a dozen x-rays of his right hip area were taken

during that time period in an effort to identify the cause of his pain.  *Id.;*

*see also*  Kooi Decl. (Dkt. No. 56-5) ¶ 7.  In addition, Taylor was provided

with special medical boots to help decrease the level of stress in his hip

area, including in 2001, 2003, 2005, and 2007.  McCartin Decl. (Dkt. No.

56-2)  Dep. Exhs. 2, 3, 4, 5, and 8.  During that six-year period plaintiff's

hip pain, as well as his various other pain complaints, were treated with a

variety of prescription and non-prescription medications, including

Percocet, a strong narcotic pain reliever similar to morphine and

comprised of a combination of Oxycodone and Acetaminophen; Naprosyn,

a prescription arthritis pain medication; Flexeril, a prescription muscle pain

medication; Tylenol #3 with Codeine, a prescription pain medication;

Feldene, a prescription arthritis pain medication; Ultram, a narcotic-like

pain medication; Motrin; Tylenol; Advil; and aspirin.  Coryer Decl. (Dkt. No.

56-7) ¶ 6; Dep. Tr. pp. 25, 34, 46, 60 and Exhs. 9, 15, 16, 17, 18, 19, 20,

23, 24, 25, and 36.

  Based upon their review of plaintiff's available records, medical

officials at Auburn attributed the source of plaintiff's pain to osteoarthritis, sometimes referred to as degenerative joint disease, a condition that occurs primarily in older persons and is characterized by chronic degeneration of the cartilage of the joint.  Kooi Decl. (Dkt. No. 56-5) ¶¶ 8-10; Dep. Tr. pp. 37-38, 43-44.  This conclusion was buttressed by x-rays taken of plaintiff's right hip area, including one dated August 23, 2006 revealing "severe arthritic changes of the right hip joint."  McCartin Decl. (Dkt. No. 56-2) Dep. Exh. 13; Kooi Decl. (Dkt. No. 56-5) ¶¶ 8-10.

Medical officials at Auburn arranged for Taylor to be seen on August 18, 2006 by an outside orthopedic specialist, Dr. Mitchell Rubinovich, Second Amended Complaint (Dkt. No. 48) Attachment ¶ 14; McCartin Decl. (Dkt. No. 56-2) Dep. Exh. 16.  In a report of his examination, Dr. Rubinovich noted the following:

> On exam, [plaintiff] has got a very painful range of movement in the hip.  There is tenderness over the groin and over the distal femur.  The wounds are clean, however. There is no redness or swelling.  There are no signs of infection either current or previous.  X-rays show an IM nailing of a subtrochanteric fracture. There is some early degenerative change of the hip with thinning of the articular surface, but there is still some articular surface present.
>
> I think that [plaintiff] has painful hardware.  The proximal end of the nail is fairly prominent at the top.  I cannot be certain, however, that his pain is not related to the degenerative changes.

McCartin Decl. (Dkt. No. 56-2) Dep. Exh. 16.  Dr. Rubinovich suggested removal of the nail as an initial measure, and recommended Ultram to replace plaintiff's existing pain medication, Percogesic, which, according to Taylor, did not alleviate his pain.  *Id.*  Dr. Rubinovich also suggested partial weight bearing with the use of crutches.  *Id.*

Plaintiff underwent the surgery recommended by Dr. Rubinovich on December 21, 2006.  *See* Kooi Decl. (Dkt. No. 56-5) ¶ 11; McCartin Decl. (Dkt. No. 56-2) Dep. Exh. 22.  While plaintiff claims that the surgery cured his problems "100%", he acknowledges the existence of continued hip pain since his surgery, for which he is receiving Percocet.  Dep. Tr. p. 56; *see also* Kooi Decl. (Dkt. No. 56-5) ¶ 13.  In plaintiff's words, the need for Percocet to treat his hip pain stems from the existence of persistent "bone-on-bone" pain in his hip and the need for a total hip replacement. Dep. Tr. pp. 6, 56, 60.  As a result of the pain, despite his December 21, 2006 surgery, plaintiff is required to use a cane to ambulate throughout the prison.  Dep. Tr. pp. 18-19.  More than one medical specialist has informed the plaintiff of his need for a complete right hip replacement, a measure that has been offered by the DOCCS but refused by Taylor. Dep. Tr. pp. 56-57; Kooi Decl. (56-5) ¶¶ 15-16; McCartin Decl. (Dkt. No. 56-2) Dep. Exhs. 39, 40, and 41; *see also* McCartin Decl. (Dkt. No. 56-2)

Dep. Exhs. 16 and 20.

In addition to his allegations surrounding the failure of prison medical personnel to refer him to an outside orthopedic specialist and arrange for hip hardware removal surgery sooner than 2006, plaintiff asserts two additional claims surrounding the surgery and post-surgical recovery.  First, plaintiff alleges that during the surgery Dr. Rubinovich did more than authorized by the plaintiff as, Taylor contends, is evidenced by x-rays showing that a portion of his hip bone is now "missing".  Second Amended Complaint (Dkt. No. 48) Attachment ¶ 22.  There is no indication in the record now before the court, however, that any of the defendants named in plaintiff's complaint had any role in determining the scope of surgery to be performed by Dr. Rubinovich, who is neither a DOCCS employee nor a named defendant in the action.

Plaintiff also asserts that upon his return to Auburn following the December 21, 2006 surgery he developed an infection, causing his leg to swell and emit a liquid discharge, and resulting in pain.  Amended Complaint (Dkt. No. 48) Attachment ¶ 19.  In response to his complaints, DOCCS medical staff at Auburn took a culture sample from plaintiff's leg area and performed testing, which through January 5, 2007 revealed no signs of infection in the sample collected on January 1, 2007, although a

result received later revealed that on January 8, 2007 the signs of an infection appeared in the tested sample.  Dep. Tr. pp. 64-65; McCartin Decl. (Dkt. No. 56-2) Dep. Exhs. 26, 27, 28, 29 and 30; Kooi Decl. (Dkt. No. 56-5) ¶ 21-22.  Dep. Tr. p. 29; McCartin Decl. (Dkt. No. 56-2) Dep. Exh. 30.  Despite not having an earlier, positive indicator for infection plaintiff was nonetheless treated with injections of Rocephin R, an antibiotic designed to fight bacteria, including severe or even life-threatening forms of infections such as menagitis, beginning on January 1, 2007.  Kooi Decl. (Dkt. No. 56-5) ¶ 23 and Exh. A; Dep. Tr. 66-67.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action in the United States District Court for the Southern District of New York.  Dkt. No. 1.  Following a transfer of the case to this district, see Dkt. No. 5, and plaintiff's filing of an amended complaint with this court as a matter of right on October 2, 2009, see Dkt. No. 8, two motions were filed in the action.  In the first, received on December 14, 2009, plaintiff sought leave to amend his complaint in order to permit restoration of his previously-dismissed claims against Physician's Assistant ("PA") Laux, a DOCCS employee at Auburn, and the addition of Dr. Graceffo, a present or former prison physician at Auburn, as a named defendant.  Dkt. No. 29.  That motion was followed by

defendants' filing of an application on December 28, 2009, seeking

dismissal of plaintiff's claims on a variety of bases.  Those motions

resulted in my issuance of a report on September 22, 2010,

recommending that plaintiff's motion for leave to amend be granted, and

additionally that defendants' dismissal motion be granted, in part, and that

plaintiff's claims against defendants Glenn S. Goord, the agency's former

Commissioner, Dr. Lester Wright, the Deputy Commissioner and Chief

Medical Officer of the DOCCS, and former Auburn Superintendent

Graham be dismissed.  Dkt. No. 42.  That report and recommendation

was adopted by order issued by Senior District Judge Frederick J. Scullin

on September 24, 2010.  Dkt. No. 44.

On October 20, 2010, plaintiff filed a second amended complaint in

the action.  Dkt. No. 48.  In that pleading plaintiff has named an array of

DOCCS employees as defendants, including the three defendants who

were previously dismissed from the action, as well as Dr. Pang L. Kooi,

Dr. J. Dolan, and Dr. Graceffo, three prison physicians employed at one

time or another at Auburn; PA Laux; and Nancy Ryerson, a Nurse

Administrator at the facility.[3]  *Id.*  Plaintiff's complaint sets forth a single

---

[3]      While plaintiff's amended complaint, like its predecessor, also lists
Commissioner Goord, Deputy Commissioner Wright, and Superintendent Graham as
defendants, as the court reminded the plaintiff in its decision and order dated February

claim for deliberate medical indifference, in violation of the Eighth

Amendment, and seeks recovery of compensatory and punitive damages,

including for future lost earnings.

Following the joinder of issue and completion of pretrial discovery,

on August 2, 2011 the remaining defendants that have appeared in the

action moved for the entry of summary judgment dismissing plaintiff's

complaint both on the merits and on the basis of qualified immunity.[4]  Dkt.

No. 56.  That motion, which is now fully briefed, *see* Dkt. No. 60, has been

---

2, 2011, *see* Dkt. No. 49, p. 3 n.1, the claims against those defendants have been
dismissed, albeit with leave to replead.  Dkt. No. 44.  Since plaintiff's amended
complaint does not add any new allegations to his earlier complaints reflecting
personal involvement in the constitutional violations alleged on the part of those three
defendants, his claims against them remain dismissed.

[4]      As was noted earlier, in the second amended complaint plaintiff has
added Dr. Graceffo as a defendant, both individually and in his official capacity.  No
summons was ever issued by the clerk, however, regarding that defendant and to date
he has neither been served nor otherwise appeared in the action. The court has
reviewed the allegations against defendant Graceffo, *sua sponte*, for facial plausibility
pursuant to 28 U.S.C. § 1915 and 1915A.  Nowhere in plaintiff's complaint does he
allege that defendant Graceffo participated in the allegedly inadequate treatment of
him over the period subsequent to 2000.  Rather, plaintiff alleges that Dr. Graceffo was
his physician, prior to Dr. Dolin, and presumably before Dr. Kooi, and in that capacity
led by example, causing other medical staff to be indifferent to Taylor's serious
medical needs.  *See* Second Amended Complaint (Dkt. No. 48) Attachment ¶ 21.
These conclusory allegations are insufficient to demonstrate the existence of a
plausible claim that defendant Graceffo was personally involved in any alleged
deliberate indifference to his serious medical needs.  *Wright v. Smith,* 21 F.3d 496,
501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.
1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434
U.S. 1087, 98 S. Ct. 1282 (1978)).  Accordingly, as part of my report I am
recommending that the court dismiss any claims asserted in the second amended
complaint against Dr. Graceffo.

referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

    Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at

2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v.*

*Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is

warranted only in the event of a finding that no reasonable trier of fact

could rule in favor of the non-moving party.  *See Building Trades*

*Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

> B.   Merits of Plaintiff's Deliberate Indifference Claim

In his complaint Taylor argues that defendants' actions in failing to

discern that the source of his hip pain was a protruding pin, installed in

1994, and to arrange for him to be seen by an outside orthopedic

specialist and to have the pin removed before 2006, represented

deliberate indifference to a serious medical need.  While acknowledging

that he received periodic medical attention, x-rays, medical treatment, and

pain medication during the period from 2000 when he began complaining

of the pain until 2006, plaintiff maintains that the defendants were

nonetheless apathetic toward his deteriorating condition, therefore making

them potentially liable under the Eighth Amendment for deliberate

indifference.

Defendants counter that plaintiff's condition was monitored by

medical personnel at Auburn and believed to be the result of degenerative arthritis, an opinion which in their view has been confirmed by subsequent events, and that rather than ignoring his condition they monitored and treated it as they believed appropriate up through 2006 when he was referred to an outside specialist, and surgery was ultimately performed. Defendants also maintain that their actions in treating plaintiff's infection were prudent and did not constitute medical indifference.  Lastly, they argue that in the event Dr. Rubinovich exceeded the scope of surgery authorized by the plaintiff, they are not responsible for his actions.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976).  The Eighth Amendment prohibits punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v.*

*Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).[5]  Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm.  *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death,

---

[5]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d

550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff

must also demonstrate that the accused defendant had "the necessary

level of culpability, shown by actions characterized by 'wantonness.'"

*Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

1.   <u>Objective Requirement</u>

Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . .

.", and centers upon whether prison officials acted reasonably in treating

the plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the

objective test addresses whether the inadequacy in medical treatment

was sufficiently serious.  *Id*. at 280.  If there has been a complete failure to

provide treatment, the court must look to the seriousness of the inmate's

medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.

2003).  If, on the other hand, the complaint alleges that treatment was

provided but was inadequate, the seriousness inquiry is more narrowly

confined to that alleged inadequacy, rather than focusing upon the

seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at

280.  "For example, if the prisoner is receiving on-going treatment and the

offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition

that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

I have serious doubts as to whether Taylor can ultimately establish that, objectively, the failure to treat his right hip was sufficiently serious to rise to the level of an Eighth Amendment violation.  Rather than revealing a complete failure to provide medical treatment for plaintiff's complaints, the record reflects that the defendants and other medical personnel at Auburn provided continuous ongoing treatment, the disagreement being over the sufficiency and propriety of that treatment.  It is true, as plaintiff asserts, that even when ongoing medical treatment is provided the failure over a period of time to address a degenerative medical condition can at some point become tantamount to a refusal to provide treatment.  *Smith*, 316 F.3d at 186.  Delay in treatment, however, does not amount to a constitutional violation "unless it involves an act or failure to act that evinces 'a conscious disregard of substantial risk of harm.'"  *Benjamin v. Kooi*, No. 9:07-CV-0506, 2010 WL 985844, at *8 (Feb. 25, 2010) (Homer, M.J.) (quoting *Thomas v. Nassau Cnty. Corr. Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003)), *report and recommendation adopted*, 2010 WL

985823 (N.D.N.Y. Mar. 17, 2010) (Kahn, J.). "'The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.'" *Id.* (quoting *Thomas*, 288 F. Supp. 2d at 339); *Moody v. Pickles*, No. 9:03-CV-850, 2006 WL 2645124, at *8 (N.D.N.Y. Sep. 13, 2006) (citing *Smith*, 316 F.3d at 184-87).

In this case, the record is devoid of any evidence, or even the allegation, that the defendants' delay in scheduling plaintiff for surgery to remove the hardware from his right hip was motivated by a desire to punish plaintiff. There is similarly no evidence demonstrating that at any point before the surgery conducted by Dr. Rubinovich plaintiff's condition was either life-threatening or degenerating quickly. The question of whether plaintiff's complaints of pain were ignored and surgery unduly delayed presents a slightly closer question. Though plaintiff claims that to have suffered significant pain in his right hip for a period of six years, his ambulatory health record ("AHR") fails to support this conclusory assertion, and instead demonstrates that shortly after he complained of increased pain, he was seen by an orthopedic surgeon for consultation and soon thereafter underwent the recommended surgery. *See generally*

Coryer Decl. (Dkt. No. 56-7) Exh. A (hereinafter cited as "Plaintiff's AHR").

Upon plaintiff's transfer into Auburn, on or about January 27, 2000, it was noted that plaintiff had a hip replacement; no hip pain was noted at that time.[6]  Plaintiff's AHR, 1/27/00 entry.  Plaintiff's AHR further reveals that, over the course of more than six years while Taylor was confined to Auburn, he was seen and treated by medical personnel on numerous occasions for a variety of ailments, including a knee problem, right arm numbness, right shoulder pain, chest pain, gastrointestinal problems, dental surgery, superficial scratches from an altercation, a broken finger, a problem with his left eye, and various cold and flu-type symptoms.  *See generally*, Plaintiff's AHR.  Between January 2000 and January of 2006, plaintiff was scene by medical personnel on at least fifty-seven separate occasions; complaints of hip pain were noted only on six separate visits during that period, and pain medication was administered each time plaintiff complained.  *See* Plaintiff's AHR, 12/10/01 entry (noting complaint of "hip discomfort"); 2/7/02 entry (noting complaint of hip pain); 2/14/02

---

[6]     Although the record is not entirely clear in this regard, plaintiff's medical records suggest that in 1994 plaintiff had both a left and right side hip replacement. *Compare* Plaintiff's AHR, 1/27/00 and 2/3/00 entries (noting left total hip replacement) with 2/10/00 entry (noting right total hip replacement).  Plaintiff, however, has only referenced the placement of a pins and a rod in right hip and femur, and has made no mention of a prior hip replacement.

entry (noting complaint of hip pain); 11/5/04 entry (noting <u>left</u> hip pain

"intermittently") (emphasis added); McCartin Decl. (Dkt. No. 56-2) Dep.

Exh. 6 (10/3/05 entry noting complaint of pain in right hip and plaintiff's

request for an x-ray); and 11/30/05 (noting right back and hip pain "worse

with walking").[7]  Plaintiff admits that during this period of time he received

medical boots to help alleviate his pain, and also claims to have received

at least a dozen x-rays just of his hip.[8]

It was not until 2006 when plaintiff's right hip pain appears to have

worsened.  On January 3, 2006, it was noted that plaintiff was

experiencing <u>left</u> hip pain.[9]  McCartin Decl. (Dkt. No. 56-2) Dep. Exh. 9.

On the following visit a week later, it was indicated that plaintiff had a

bilateral hip replacement and was complaining of pain from his waist to his

legs; it was also noted that boots with inserts had been recommended, but

plaintiff "refused the workup in 2001."  Plaintiff's AHR, 1/10/06 entry.  The

next notation of hip pain did not occur until six months later, at which time

_____

[7]      On September 27, 2005 plaintiff requested an extra mattress, at the time
it was reported that he had a right total hip replacement.  *See* Plaintiff's AHR 9/27/05.
No pain, however, was noted at that time.  *See id.*

[8]      The only x-ray report included in the record and specifically referred to by
Dr. Kooi is that of August 23, 2006.  *See* Kooi Decl. (Dkt. No. 56-5) ¶¶ 7-10.

[9]      When plaintiff was questioned regarding this entry at his deposition, he
acknowledged that it refers to left hip pain, and did not deny its accuracy.  *See* Dep.
Tr. pp. 24-25.

it was indicated that plaintiff was "now [complaining of] severe right hip pain." *See id.* at 7/7/06 entry.  At that time, x-rays were ordered as was an orthopedic consultation.  *See id.*  Within less than a month, plaintiff was seen by Dr. Rubinovich, who was somewhat equivocal in his opinion as to the cause of plaintiff's right hip pain, but noted that plaintiff's severe pain had developed over the preceding four months, an observation that is contrary to plaintiff's present claim that he suffered increasingly over a six-year period.

Eleven days after his visit with Dr. Robinovich, plaintiff was seen at sick call, on August 29, 2006, again complaining of right hip pain and demanding pain medication.  *See* Plaintiff's AHR, 8/29/06 entry.  The notes of that visit indicate that the x-rays conducted the previous week had been reviewed by a physician's assistant who had concluded that the results indicated degenerative changes and some arthritis, and also that plaintiff had recently refused Percogesic, claiming that it did not help.  *See id.*  With continued complaints of right hip pain on September 5, 2006, it was noted that plaintiff was able to tolerate block work, that he would be given a cane as recommended by the orthopedic surgeon, and that surgery for removal of the hardware would be scheduled.  That surgery was, in fact, performed on December 21, 2006.

In the first instance, the record before the court does not seem to support plaintiff's contention that there was a significant delay in the treatment of his pain.  Despite plaintiff's well-documented medical history and treatment, the only evidence that plaintiff consistently suffered and complained of significant pain in his right hip from the time of his admission in to Auburn until the time of his surgery in December 2006 is plaintiff's deposition testimony that for six years he complained of right hip pain to anyone who would listen.[10]  Moreover, the evidence in the record suggests that plaintiff's condition did not become dire until July 2006, and that immediately upon plaintiff's complaint of severe pain x-rays were ordered, and he was referred for an orthopedic consult.  The lag between the time that doctor recommended surgery and the time that surgery was conducted was approximately four months, and the only evidence of any adverse effect suffered by Taylor as a result of the four-month wait for surgery is increased pain, for which he received pain medication and was given a cane, all of which casts significant doubt on whether plaintiff can prove a sufficiently serious condition from an objective point of view.  *See*

---

[10]     Not insignificantly, the first documented complaint in which plaintiff contends that prison medical personnel failed to properly treat him that is contained in the record is a letter to the New York Inspector General dated June 26, 2009.  *See* Plaintiff's Exhibits (Dkt. No. 60-3).

*Balkum v. Unger*, No. 06-CV-6578, 2009 WL 290439, at *5 (W.D.N.Y. Feb. 5, 2009) (finding six-month delay in conducting plaintiff's shoulder surgery, from which he suffered but pain no deterioration in his condition insufficient to meet the objective prong of the Eighth Amendment medical indifference test.); *Gillespie v. New York State Dep't Corr. Srvs.* No. 9:08-CV-1339, 2010 WL 1006634, at *5 (N.D.N.Y. Feb. 22, 2010) (Observing on a Rule 12(b)(6) motion that "[t]he medical records attached to the complaint document that, over a period of three years, plaintiff periodically claimed to suffer pain, variously described as 'intermittent,' 'chronic,' 'increasing'; but he only once used the term 'severe' and never used other adjectives such as 'extreme,' 'excruciating,' or 'unbearable.' . . .  It is extremely questionable that plaintiff has alleged a medical condition that is sufficiently serious for the purposes of the Eighth Amendment.") (citing *Veloz v. New York*, 339 F. Supp. 2d 505, 522-26 (S.D.N.Y.2004)).

Nonetheless, after careful review of the record and crediting plaintiff's deposition testimony, I decline to recommend a finding that the delay in performing surgery on plaintiff's right hip was not sufficiently serious to establish an Eighth Amendment violation.

2.    <u>Subjective Element</u>

Turning to the second prong of the test, however, it seems clear

that the evidence in the record fails to support the subjective requirement

for establishing an Eighth Amendment medical indifference claim, which

mandates a showing of a sufficiently culpable state of mind, or deliberate

indifference, on the part of one or more of the defendants.  *Salahuddin*,

467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct.

2321, 2325 (1991)).  Deliberate indifference, in a constitutional sense,

exists if an official "knows of and disregards an excessive risk to inmate

health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists,

and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837,

114 S. Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y.

2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998

WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.)

(same).  Deliberate indifference is a mental state equivalent to subjective

recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at

280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

        In this instance, the record is devoid of evidence from which a

reasonable factfinder could conclude plaintiff has satisfied the subjective

requirement of the Eighth Amendment test.  In his affidavit, Dr. Kooi states

that a series of x-rays taken over time of plaintiff's right hip revealed

degenerative changes that he attributed to osteoarthritis.  *See* Kooi Decl. (Dkt. No. 56-5) ¶¶ 8-10.  Dr. Kooi and other medical personnel thereafter rendered treatment and monitored plaintiff's condition based upon that diagnosis.  While plaintiff contends that this assessment was mistaken, and in his lay opinion a proper reading of the x-rays would have revealed a protruding pin likely to be the source of pain, his argument represents nothing more than a difference of opinion regarding diagnosis or, at most, a claim of malpractice, neither of which is actionable under section 1983. *Jordan v. Fischer*, 773 F. Supp. 2d 255, 276 (N.D.N.Y. 2011) (citing *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y.2001) and *Daniels v. Williams*, 474 U.S. 327, 332, 106 S. Ct. 662 (1986)); *see also Gillespie*, 2010 WL 1006634, at *6.

Plaintiff places heavy reliance upon the ultimate findings of Dr. Rubinovich, the orthopedic specialist seen by him in August 2006, as well as that consultant's recommendation that Taylor undergo surgery to remove the "hardware" installed several years earlier.  It bears emphasizing, however, that in his report Dr. Rubinovich acknowledged his uncertainty that the hardware was the source of plaintiff's pain and noted the existence of degenerative changes, including thinning of the articular surface of the hip, a finding supportive of Dr. Kooi's assessment of

osteoarthritis.  In any event, as I have already noted, the mere fact that Dr.

Rubinovich may have arrived at a different conclusion and outcome than

Dr. Kooi does not establish medical indifference, since a mere

disagreement among professionals does not in and of itself support the

existence of a medical indifference claim.  *See Rosales v. Coughlin*, 10 F.

Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted); *Amaker v. Kelly*,

No. 9:01-CV-877, 2009 WL 385413 at *14-16 (N.D.N.Y. Feb. 9, 2009)

(Scullin S.D.J. and Peebles, M.J.)

The cases offered by plaintiff in support of his Eighth Amendment

claim are readily distinguishable from the circumstances now presented.

*Sulton v. Wright*, for example, involved an incarcerated plaintiff who

injured his knee in October of 1998.  265 F. Supp. 2d 292, 294 (S.D.N.Y.

2003).  Magnetic Resonance Imaging ("MRI") testing twelve days later

revealed tears of the anterior and posterior cruciate ligaments of the

plaintiff's knee.  *Id.*  The plaintiff in that case alleged that despite

recommendations by orthopedic specialists on three separate occasions,

including in April 1999, January 2000, and November 2000, indicating that

surgery was warranted, it was not performed until two years after the last

recommendation, on September 12, 2002.  *Id.* at 294-95.  During the

interim, due to instability caused by the knee injury, plaintiff injured his

right Achilles tendon on two separate occasions and at one point was confined to a wheelchair. *Id.* In a decision pre-dating the Second Circuit's decision in *Salahuddin*, the court denied the defendants' Rule 12(b)(6) motion to dismiss, which imposes a significantly lesser burden upon a plaintiff that a Rule 56 motion for summary judgment,[11] finding that plaintiff's complaint sufficiently alleged an Eighth Amendment deliberate indifference claim against the defendants involved in his treatment. *Id.* at 300.

In this case, unlike *Sulton*, there was no clear indication to the defendants that surgery was warranted. As I have already discussed at length, plaintiff's AHR does not show that he consistently complained of increased or severe pain up until August of 2006 when he attended the orthopedic consult. Furthermore, even after plaintiff saw the orthopedic

---

[11]    A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6), calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, 1964-65 (2007)). To withstand a motion to dismiss, a complaint need only plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). By contrast, as was previously discussed, defendants' summary judgment motion the court must determine whether, when the record before the court is viewed in a light most favorable to the plaintiff, a reasonable factfinder could find that the defendants were deliberately indifferent to his serious medical needs. *See* pp. 11-13, *ante*.

surgeon the need for surgery was not definitive as Dr. Rubinovich stated

that he could not rule out degenerative changes, as opposed to the

hardware, as the cause of plaintiff's pain.

*Ruffin v. DePerio*, another case relied upon by the plaintiff which

pre-dates *Salahuddin*, is similarly inapposite.  97 F. Supp. 2d 346, 349

(W.D.N.Y. 2000).  That case involved a diabetic inmate injured when a

table fell on his left foot.  *Id.* at 349.  While the accident occurred in March

of 1994, and plaintiff was thereafter seen regularly by several members of

the medical staff at the prison facility in which he was housed, plaintiff

alleged that his condition worsened, and it was not until June and July of

1995 that he underwent surgical procedures, which resulted in the

amputation of several toes and part of his left foot, leading ultimately to

amputation of his left leg below the knee.  *Id.*  Rejecting defendants' claim

that the frequency with which plaintiff was seen by medical officials

negated a finding that plaintiff could satisfy the subjective element of the

governing Eighth Amendment test, the court concluded that the apathy

demonstrated by the mere documenting of plaintiff's progressively

deteriorating condition without the taking of any action could lead a

reasonable jury to conclude "that defendants' conduct was a substantial

departure from accepted professional judgment and that the evidence of

risk was sufficiently obvious to infer the defendants' actual knowledge of a substantial risk to plaintiff [,]" and therefore denied defendants' motion for summary judgment. *Ruffin,* 97 F. Supp. 2d 352-55.

Here, however, there is no evidence in plaintiff's AHR establishing the deterioration of plaintiff's right hip.  Indeed, in contrast to the cases upon which plaintiff relies, Taylor's exhaustive medical records include relatively few documented complaints of hip pain, which include both general complaints of "hip pain" and specific concerns regarding left or right hip pain, during a five-year period.  July 2006 marked the occurrence of plaintiff's first complaint of severe right hip pain.  Additionally, in light of plaintiff's medical history and based upon x-rays that were ordered at that time, the defendants in this action did not ignore plaintiff, but assessed his condition and formed an opinion concerning the source of plaintiff's pain; that opinion is substantiated by the evidence in the records including the x-rays, which show severe degenerative joint disease, as well as the events subsequent to plaintiff's surgery, which confirm the continuation of joint degeneration and the need ultimately for plaintiff to undergo a hip replacement.[12]

---

[12]     In fact, almost immediately after the December 2006 surgery plaintiff began to complain of pain, once again.  In a follow up visit with Dr. Rubinovich on January 19, 2007, in his report the doctor specifically noted, "[f]inally, there is the

"[A] delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady" will not constitute deliberate indifference. *Harrison*, 219 F.3d at 139. In this case, defendants' opinions concerning the source of plaintiff's pain and their treatment of Taylor, through the use of pain medication and continued monitoring, at most represent an incorrect assessment of the major cause of his pain, such conduct simply does not rise to the level of apathy presented in the cases now relied upon by Taylor. *See Sanchez v. Wright*, No. 09-CV-469S(Sr.), 2012 WL 528578, at *7 (W.D.N.Y. Feb. 17, 2012); *Gillespie*, 2010 WL 1006634, at *5-6; *see also Jordan*, 773 F. Supp. 2d at 276-77.

The circumstances surrounding defendants alleged failure to treat plaintiff's post-operative infection similarly fail to support plaintiff's claim of

---

matter of persistent pain. Some of it is definitely arthritis he has in the hip joint. I have discussed options about this, but Terence [sic] does not feel at this point he is willing to undergo any further surgeries." Plaintiff's AHR, 1/19/17 report. Additionally, just months later notes from a May 10, 2007 sick call visit indicate that plaintiff was complaining of increased pain to his hip and that Motrin was ineffective. *See id.*, 5/10/07 entry. His complaints persisted thereafter. *See generally* Plaintiff's AHR, entries of 10/10/11-12/21/07. Plaintiff resumed the use of a cane in the later part of 2009 and taking Percocet in mid-2010. Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 60) ¶¶ 21-22.

subjective indifference.  Upon receiving a report suggesting the possibility

of infection, defendants immediately began treating the plaintiff with an

antibiotic designed to fight bacteria, including severe or even life

threatening forms of infection such as menagitis.  Kooi Decl. (Dkt. No. 56-

5) ¶ 23 and Exh. A.  In addition that area was cultured and tested,

ultimately confirming the presence of an infection.  *Id.* at ¶ 21; *see also*

Dep. Tr. 64-65 and Exhs. 26-28.  Based upon these facts, no reasonable

factfinder could conclude that defendants were deliberately indifference to

plaintiff's post-operative infection.

     The third component of plaintiff's complaint fails to implicate any of

the defendants in the case.  Plaintiff asserts that Dr. Rubinovich exceeded

the permissible bounds of surgery by removing a portion of his hip without

authorization.  There is no indication, however, that any of the defendants

named in plaintiff's complaint were complicit in or approved of the scope

of Dr. Rubinovich's surgery.  It is axiomatic that personal involvement in

conduct giving rise to constitutional claims must be shown in order to hold

a named defendant liable for any deprivation.  *See Balkum*, 2009 WL

290439 at * 5.

     Having carefully surveyed the record now before the court, I find

no evidence from which a reasonable factfinder could conclude that the

defendants knew of and disregarded an excessive risk to plaintiff's health and safety and that they acted with "subjective recklessless" in their treatment of the plaintiff.  Accordingly, I recommend dismissal of plaintiff's medical indifference claim.[13]

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's claim in this action relates to defendants' treatment of his hip condition over the period from 2000-2006, as well as following hip surgery in December 2006 in relation to his development of an infection. During the period leading up to the surgery medical officials at Auburn regarded plaintiff's reported hip pain as stemming from degenerative changes attributable to osteoarthritis, a condition which x-rays confirm plaintiff suffers from, and he was treated and monitored accordingly.  The record is devoid of any evidence from which a reasonable factfinder could conclude that, subjectively, the defendants were aware of but disregarded an excessive risk to plaintiff's health and safety by not providing proper medical treatment.  Instead, the record before the court at best demonstrates an uncertainty among medical professionals, including the

_____

[13]    In view of my recommendation on the merits I do not find it necessary to address defendants' claim that they are entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156 (2001); *Harhay v. Town of Elington Bd. of Ed.,* 323 F.3d 206, 211 (2d Cir. 2003); *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir. 1999) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)).

outside orthopedic consultant engaged to examine the plaintiff and later to perform surgery, concerning the source of plaintiff's chronic hip pain. The record similarly fails to contain evidence to support a finding that defendants were deliberately indifferent to plaintiff's serious medical needs by virtue of the manner in which his post-operation infection was treated. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 56) be GRANTED, and that all remaining claims contained within plaintiff's second amended complaint in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of

this report and recommendation upon the parties in accordance with this

court's local rules; and it is further

David E. Peebles
U.S. Magistrate Judge

Dated: February 29, 2012
        Syracuse, NY



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**C**

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:

(1) there was no evidence that administrative remedy was
available to inmate;

(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;

(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;

(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;

(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A**  $\Longleftarrow$  **2547.1**

170A Federal Civil Procedure
　170AXVII Judgment
　　170AXVII(C) Summary Judgment
　　　170AXVII(C)3 Proceedings
　　　　170Ak2547 Hearing and Determination
　　　　　170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A**  $\Longleftarrow$  **25**

170A Federal Civil Procedure
　170AI In General
　　170AI(B) Rules of Court in General
　　　170AI(B)1 In General
　　　　170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A**  $\Longleftarrow$  **2547.1**

170A Federal Civil Procedure
　170AXVII Judgment
　　170AXVII(C) Summary Judgment
　　　170AXVII(C)3 Proceedings
　　　　170Ak2547 Hearing and Determination
　　　　　170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4] Federal Civil Procedure 170A** ☞ **657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5] Attorney and Client 45** ☞ **62**

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

**Federal Civil Procedure 170A** ☞ **657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

**Federal Civil Procedure 170A** ☞ **2546**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6] Civil Rights 78** ☞ **1304**

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7] Prisons 310** ☞ **317**

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8] Prisons 310** ☞ **313**

310 Prisons

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
    310II(H) Proceedings
        310k307 Actions and Litigation
            310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78 🗝️    1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
            78k1319 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H 🗝️    1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H 🗝️    1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H 🗝️    1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310 🗝️    192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** ☞ **192**

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treatments
            310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** ☞ **192**

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treatments
            310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** ☞ **2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test, precluded
summary judgment in inmate's § 1983 action alleging
officials' deliberate indifference to his medical needs, in
violation of Eighth Amendment. U.S.C.A. Const.Amend.
8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H ☞   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most
Cited Cases
An inmate's chronic pain can constitute a "serious medical
condition" for purposes of claim of deliberate indifference
to a serious medical need under the Eighth Amendment.
U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A ☞   2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition, and
whether prison medical staff acted with deliberate
indifference by failing to prescribe pain medication or take
x-rays, despite inmate's ongoing complaints, precluded
summary judgment, in inmate's § 1983 Eighth Amendment
claims against medical staff. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.

**[20]** Civil Rights 78 ☞   1355

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most
Cited Cases
Supervisor liability in § 1983 action can be shown in one
or more of the following ways: (1) actual direct
participation in the constitutional violation, (2) failure to
remedy a wrong after being informed through a report or
appeal, (3) creation of a policy or custom that sanctioned
conduct amounting to a constitutional violation, or
allowing such a policy or custom to continue, (4) grossly
negligent supervision of subordinates who committed a
violation, or (5) failure to act on information indicating
that unconstitutional acts were occurring. 42 U.S.C.A. §
1983.

**[21]** Civil Rights 78 ☞   1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate
indifference to medical needs of inmate related to inmate's
end stage renal disease or chronic shoulder pain; there was
no showing that sheriff was personally involved in denying
medical treatment to inmate, or that there was a custom or
policy at prison of allowing alleged constitutional
violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §
1983.

**[22]** Federal Civil Procedure 170A ☞   2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether registered
nurse on prison medical staff was personally involved in
prison's alleged failure to arrange for inmate's kidney
transplant test precluded summary judgment in inmate's §
1983 action alleging officials' deliberate indifference to his
medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23] Civil Rights 78** 👈 **1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24] Federal Civil Procedure 170A** 👈 **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
**\*347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiff's claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.<sup>FN1</sup> They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving**349 at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

   FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

   FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **\*351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted**\*352** an opposition to the motion on August 3 and August 11, 2009.[FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

*R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported **353 by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.FN11 For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

  FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has a bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also* *Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also* *Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription**359 of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardner,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. **\*360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See* Smith, 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See* Lewal v. Wiley, 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed *361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. *See Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994); *see also Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (*see* Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective. [FN19] (*See, e.g.,* Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (*See* Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (*See* Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id. at 145* (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### 2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to *366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the
Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin,
Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned
for Report-Recommendation by the Hon. David
N. Hurd, United States District Judge, pursuant
to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

**\*1** Plaintiff, *pro se,* Karus LaFave ("LaFave") originally
filed this action in Clinton County Supreme Court. The
defendant filed a Notice of Removal because the
complaint presented a federal question concerning a
violation of LaFave's Eighth Amendment rights (Dkt. No.
1). Currently before the court is the defendant's motion to
dismiss made pursuant to Rule 12(b)(6) and in the
alternative, pursuant to Rule 56(b) of the Federal Rules of
Civil Procedure (Dkt. No. 5). LaFave, in response, is
requesting that the court deny the motion, excuse his
inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing
LaFave's claims and for the reasons set forth below, the
defendant's converted motion for summary judgment
should be granted.

FN2. It should be noted that the date for
dispositive motions was February 16, 2001. The
defendant's motion to dismiss was filed on
September 29, 2000. On January 9, 2001, this
court converted the defendant's motion to dismiss
to a motion for summary judgment, and gave
LaFave a month to respond. On April 16, 2001,
after three months and four extensions, LaFave
finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983
claiming that the defendant violated his civil rights under
the Eighth Amendment [FN3]. He alleges that the defendant
failed to provide adequate medical and dental care causing
three different teeth to be extracted.

FN3. LaFave does not specifically state that the
defendant violated his Eighth Amendment rights
but this conclusion is appropriate after reviewing
the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court
with a "statement of material facts not in issue"
and LaFave provided the court with "statement
of material facts genuine in issue," neither
provided the court with the exact nature of the
facts.

Between January and July of 1999, LaFave, on several
occasions, requested dental treatment because he was
experiencing severe pain with three of his teeth. After
being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290* (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at *4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4*) .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Rabindranath BENJAMIN, Plaintiff,
v.
Pang Lay KOOI, Medical Doctor; Carol Wallace,
Registered Nurse, Cayuga County Jail; and Jackie
Chadwick, Registered Nurse, Cayuga County Jail,
Defendants.
**No. 9: 07-CV-0506 (LEK/DRH).**

Feb. 25, 2010.

Rabindranath Benjamin, Philipsburg, PA, pro se.

Petrone & Petrone, P.C., David H. Walsh, IV, Esq., of Counsel, Utica, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Rabindranath Benjamin ("Benjamin"), formerly an **inmate** in the custody of the Cayuga County Jail ("Cayuga") and currently in custody in the State of Pennsylvania, brings this action pursuant to 42 U.S.C. § 1983 alleging that three Cayuga employees violated his constitutional rights under the Eighth and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion for **summary judgment** pursuant to Fed.R.Civ.P. 56. Dkt. No. 42. Benjamin opposes the motion and has filed a cross-motion for **summary judgment**. Dkt. No. 44. Defendants have submitted a

reply to the motion for **summary judgment** and have responded in opposition to Benjamin's cross-motion. Dkt. Nos. 45, 46. For the reasons which follow, it is recommended that defendants' motion be granted and that Benjamin's cross-motion be denied.

**I. Background.**

The facts are related herein in the light most favorable to Benjamin as the nonmoving party. *See* subsection II.A, *infra.*

At all relevant times, Benjamin was incarcerated at Cayuga. Compl. at 4-7. On October 16, 2006, Benjamin slipped on water outside the shower area, fell, and lost consciousness. *Id.* at 4. As a result of the fall, Benjamin "suffered [from] severe neck and back pain, excruciating pain in [his] legs, loss of short-term memory, headaches and migraines, and constant pain in [his] hips." *Id.* Benjamin was transported by ambulance to Auburn Memorial Hospital where he was examined, x-rays were taken, and he had a Computed Tomography ("CT") scan. Dkt. No. 42-5, Deposition Transcript ("Tr.") at 24-25; *see also* Dkt. No. 42-1, Ex. B ("Auburn Memorial Hospital Medical Records"). The CT scan taken of his cervical spine showed narrowing and degeneration at C6-7 intervertebral disc space with moderately severe cervical spondylosis at that level. Dkt. No. 42-3 at 18-19.

After five hours, Benjamin was returned to Cayuga where he was placed in a cell for medical observation for two to three days. Tr. at 26-29; Rule 7.1 Statement (Dkt. No. 42-1), ¶¶ 7, 8. While in the observation cell, Benjamin was seen by a nurse and given 650 milligrams of Tylenol every four hours around the clock. Dkt. No. 42-1, Ex. C ("Cayuga Med. Records"); Rule 7.1 Statement, ¶ 10; Tr. at 29.[FN2] On October 16, 2006, Benjamin was also checked every thirty minutes as per instructions from the Auburn Memorial Hospital Emergency Room. *See* Cayuga Med. Records. Upon his return to Cayuga, Benjamin complained to nurses that he "was still in a lot of pain." Tr. at 29. He had neck, head, and back pain. Tr. at 30. Benjamin did not eat two to three meals because his food tray was placed on the floor and he was in too much pain

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

"to go down to the floor, to slide down to grab the tray to come back up." *Id.*

> FN2. Benjamin states that he saw either Chadwick or Wallace but does not recall which. *Id.*

Benjamin had appointments with Dr. Kooi, a defendant here, on October 20, November 2, and December 1, 2006, and on February 8, 2007 and with Nurse Wallace, a defendant, on January 6, 2006. Cayuga Med. Records. Each time Benjamin saw Dr. Kooi, Nurse Chadwick, a defendant, was present. Tr. at 39. On October 20, 2006, Benjamin told Dr. Kooi that he had pain in his neck, back and hips and found it difficult to walk. Tr. at 34. Dr. Kooi examined Benjamin and continued him on Motrin. Rule 7.1 Statement, ¶ 12; Cayuga Med. Records. Benjamin asked Dr. Kooi to prescribe stronger medication. Tr. at On November 2, 2006, Benjamin told Dr. Kooi that he was still in pain from his injuries. Tr. at 38. Benjamin complained of headaches; Dr. Kooi prescribed Advil and Tylenol. Cayuga Med. Records. Benjamin asked Dr. Kooi to have him moved to a handicapped cell; Dr. Kooi told him to take it up with the Sergeant. Tr. at 39.

**\*2** On December 1, 2006, at Chadwick's urging, Dr. Kooi saw Benjamin for headaches and prescribed Flexeril. Rule 7.1 Statement, ¶ 14; Cayuga Med. Records; Tr. at 39-40. On January 6, 2007, Wallace gave Benjamin aspirin to be taken at the onset of a headache and noted that Benjamin would be re-examined if the aspirin gave no relief. Rule 7.1 Statement, ¶ 15; Cayuga Med. Records. After Benjamin complained of headaches to Chadwick, she gave him a bottle of nasal spray, said that a dry nose could cause headaches, and the nasal spray might give him relief. Tr. at 58. Benjamin told Wallace that his headaches were from his fall, not a dry nose. *Id.* However, Wallace could not prescribe medication for him. Tr. at 50.

On February 8, 2007, Benjamin saw Dr. Kooi and complained of right chest pain. Cayuga Med. Records. Benjamin said that he was not nauseous and was eating. *Id.;* Rule 7.1 Statement. Dr. Kooi prescribed Motrin. Cayuga Med. Records; Rule 7.1 Statement, ¶ 16. Benjamin also told Dr. Kooi that he still experienced headaches "on and off" but was having more pain in his

back and hips and was having difficulty walking. Tr. at 41. Dr. Kooi told Benjamin that he would improve but that it would take six months to a year. *Id.* Benjamin told Dr. Kooi that he was still in pain. Tr. at 42. Benjamin asked Dr. Kooi for an MRI but was told that it was not necessary because an MRI was only for broken bones. Tr. at 42-43.

Benjamin was never refused a request to see Dr. Kooi. Tr. at 55-56; Rule 7.1 Statement, ¶ 18. During his time at Cayuga, Benjamin saw one of the nurses on a daily basis. Tr. at 62; Rule 7.1 Statement, ¶ 19. Benjamin was always given his prescribed medication. *Id.* Benjamin continued to complain of frequent and severe headaches and lower back pain in September through December, 2007. Dkt. No. 44-2, Ex. A. On September 24 and December 20, 2007, Benjamin was seen by medical staff at Moshannon Valley Correctional Center for complaints of low back pain exacerbated by cold weather. *Id.* He was prescribed Motrin and rest. *Id.*

During the two to three days that Benjamin was in a medical observation cell at Cayuga, he was provided with a mattress so worn that it was half the normal size. Tr. at 27. Benjamin had blankets, a sheet, and a toilet but had to wait a day before he received the sheet and blanket. Tr. at 28. He did not have a pillow. *Id.* Benjamin was then placed in the reception area dormitory for three to four days. Tr. at 36. Benjamin had a steel bed, mattress, blankets, and sheets. Tr. at 39. Benjamin was then transferred to a cell in the housing unit which had a slab of concrete on the wall for a bed, a mattress, a blanket, sheets, a toilet, a sink and a mirror. Tr. at 37. Benjamin had requested a handicapped cell and was told that "they were going to work on it." *Id.* Benjamin wanted to be placed in a handicapped cell "for the bars by the toilet" because he was having trouble walking. Tr. at 57. Benjamin requested an extra mattress and pillow, but the request was denied. Tr. at 52-53. This action followed.

## II. Discussion.

**\*3** Benjamin alleges that defendants violated his constitutional rights by denying him adequate medical care for his serious medical needs and by subjecting him to cruel and unusual conditions of confinement. Compl. Benjamin alleges that he suffers from "**pain** to the **back**,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

hips, neck and legs along with slight headaches. Benjamin has experienced excessive pain to the same areas of the body, headaches and migraines, uneven walking, lack of sleep, short-term memory loss, and loss of concentration. Compl. at 6. Benjamin also asserts that defendants denied him appropriate pain medication and diagnostic testing after his fall. *Id.* at 5-6. Finally, Benjamin alleges that his request for an extra mattress and pillow were improperly denied.[FN3] *Id.* at 6. Defendants seek **summary judgment** on the grounds that (1) Benjamin has failed to establish the personal involvement of defendants Chadwick and Wallace; (2) Benjamin's **Eighth Amendment deliberate medical indifference** claim is without merit; and (3) Benjamin's claim that his conditions of confinement amounted to cruel and unusual punishment is without merit. Dkt. No. 42.

> FN3. Additionally, Benjamin alleges that he attempted to file multiple grievances pertaining to his lack of medical treatment but he was told that since the medical staff had already treated him, the situation was resolved and he was unable to file a grievance. *Id.* at 4-5.

Benjamin has cross-moved for **summary judgment** on the grounds that (1) defendants failed to provide adequate medical treatment to him after his fall; (2) the negligent act which caused his fall was foreseeable; and (3) defendants failed to provide him with safe and secure housing. Dkt. No. 44. In response to the cross-motion for **summary judgment** and in reply to the motion for **summary judgment**, defendants assert that defendants are entitled to **summary judgment** because (1) Benjamin failed to respond to defendants' statement of material facts; (2) Benjamin has failed to raise a question of fact as to whether he suffered a serious medical condition; (3) Benjamin has failed to raise a question of fact as to whether defendants acted with deliberate indifference; and (4) any negligence claim asserted against the county is legally insufficient. Dkt. No. 45.

### A. Legal Standard

A motion for **summary judgment** may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party

is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for **summary judgment**. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*4** When, as here, a party seeks dismissal or **summary judgment** against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also* Sealed Plaintiff v. Sealed Defendant # 1, 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### B. Defendants' Motion for Summary Judgment

### 1. Benjamin's Failure To Comply with Local Rule 7.1(a)(3)

As a threshold matter, defendants assert that Benjamin's

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

failure to respond to their statement of material facts constitutes an admission to the statements contained therein. Dkt. No. 45 at 1-2. Local Rule 7.1(a)(3) of the Northern District of New York provides that a motion for **summary judgment** must include a Statement of Material Facts. "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement of Material Facts ("Rule 7.1 Statement") is submitted by the moving party, Rule 7.1 requires that the party opposing **summary judgment** file a response to the moving party's statement. *Id.* The nonmovant's response shall mirror the movant's statement by admitting or denying each of the movant's assertions in matching numbered paragraphs. *Id.* Each denial shall set forth a specific citation to the record where the factual issue arises. *Id.* The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Id.*

While Benjamin has opposed defendants' **summary judgment** motion, he has not responded to defendants' Rule 7.1 Statement [FN4] as required by Local Rule 7.1(a)(3). By its terms, Local Rule 7.1(a) (3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* See N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See N.Y. Teamsters Conference Pension & Retirement Fund v. Express Services, Inc., 426 F.3d 640, 648-49 (2d Cir.2005)* (upholding grant of **summary judgment** where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitting a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica, 154 F.3d 30, 31 n. 1 (2d Cir.1998)* (per curiam) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp., 103 F.Supp.2d 104, 108 (N.D.N.Y.2000)* (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations-specific or otherwise-to

the record"); *McKnight v. Dormitory Auth. of State of N.Y., 189 F.R.D. 225, 227 (N.D.N.Y.1999)* ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County, 47 F.Supp.2d 311, 317 (N.D.N.Y.1999)* (deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record"). Pro se litigants are not excused from compliance with the rule. [FN5]

FN4. With his cross-motion for **summary judgment**, Benjamin included what he refers to as his "Statement of Facts in Support of Motion for **Summary Judgment** for Plaintiff." Dkt. No. 44-1. Benjamin's purported Rule 7.1 Statement is not in compliance with Local Rule 7.1 because it does not set forth a specific citation to the record where each fact is established. Therefore the Rule 7.1 Statement submitted with the cross-motion is not properly supported and will not be considered by the Court to be a proper Rule 7.1 Statement. *See* N.D.N.Y.L.R. 7.1(a)(3).

FN5. *See McNeil v. U.S., 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993)* ("While we have insisted that the pleadings prepared by **prisoners** who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006)* ("[P]ro se status does not exempt a party from compliance with relevant rules of procedural and substantive law.") (citation omitted); *LoSacco v. City of Middletown, 71 F.3d 88, 92 (2d Cir.1995)* ("Although pro se litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them.... This is especially true in civil litigation.") (internal quotation marks and citations omitted).

**\*5** Because Benjamin failed to include in his opposition papers a Rule 7.1 Statement specifically controverting

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

defendants' factual assertions in matching numbered paragraphs with specific citations to the record, defendants' factual assertions in their Rule 7.1 Statement are deemed admitted by Benjamin. [FN6] Despite this, "[i]f the evidence submitted in support of the **summary judgment** motion does not meet the movant's burden of production, then **summary judgment** must be denied even if no opposing evidentiary matter is presented." *Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004)* (citations omitted). "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [statement of material facts.] It must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

      FN6. In this case, accepting the facts contained in defendants' Rule 7.1 Statement as true is in large part harmless to Benjamin, since many of the facts referenced in the statement are taken from Benjamin's testimony at his pretrial deposition.

## 2. Personal Involvement

Defendants argue that neither Chadwick nor Wallace were personally involved in any wrongdoing. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* (citing *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)* and *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977)*). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986)*. The doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson, 454 U.S. 312, 325 (1981)*; *Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)*.

Benjamin alleges that Chadwick was present every time that Dr. Kooi examined him. Compl. at 6. At his

deposition, Benjamin testified that he told Chadwick about his medical problems every day when she came to his unit, and she heard all of the complaints that he made to Dr. Kooi, yet he received no examination from anyone. Tr. at 58-59. Benjamin alleges that Wallace "denied any request [that he] put in concerning receiving medical attention" and that when he complained of migraine headaches, Wallace gave him a tube of nasal spray. Compl. at 6.

Applying the standards for personal involvement set forth above, a reasonable juror could conclude that Chadwick and Wallace were personally involved in the alleged provision of inadequate medical care to Benjamin. It is recommended, therefore, that defendants' motion for **summary judgment** in favor of Chadwick and Wallace on the basis of lack of personal involvement be denied.

## 3. Eighth and Fourteenth Amendment Claims

Benjamin asserts various claims under the Eighth Amendment, which explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. While not clear from the Complaint, it appears that Benjamin was housed at Cayuga as a pretrial detainee on federal charges. [FN7] The Eighth Amendment protections apply to those who have been convicted of a crime, sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause. *Benjamin v. Fraser, 343 F.3d 35, 49-50 (2d Cir.2003)* (citing cases). Claims concerning the conditions of confinement brought by a pretrial detainee, such as Benjamin, must be analyzed under the Fourteenth Amendment Due Process Clause. *Id.* The standards when evaluating deliberate indifference to a person in custody are identical whether brought under the Eighth or Fourteenth Amendment. *Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir.2009)* ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Shane v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989)* ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

medical care, and reasonable safety...."). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment. Therefore, Benjamin's medical indifference and conditions of confinement claims will be considered under Eighth Amendment standards.

> FN7. On September 27, 2006, Benjamin made an initial appearance in federal court on a criminal complaint. *See United States v. Benjamin,* No. 5:06-cr-0392 (N.D.N.Y.). Benjamin was remanded to custody. *Id.* Benjamin subsequently pleaded guilty on February 8, 2007 and was sentenced on May 21, 2007 to a term of incarceration. *Id.* Since the allegations in Benjamin's complaint preceded his conviction, it appears that during the time relevant to this action, he was housed at Cayuga as a pretrial detainee.

**a. Medical Indifference Claims**

**\*6** Benjamin alleges that he was denied adequate medical care in deliberate indifference to his serious medical needs while he was incarcerated at Cayuga. The Eighth Amendment imposes a duty upon prison officials to ensure that **inmates** receive adequate medical care. *Farmer v. Brennan,* 511 U.S. 825, 832-34 (1994); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); U.S. Const. amend. VIII. Not every injury or denial of medical care is a constitutional wrong. Rather, "a prison official violates the Eighth Amendment only when two requirements are met." *Farmer,* 511 U.S. at 834.

First, the **prisoner** must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the **prisoner** must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to **inmate** health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Thus, negligence alone is not actionable. *Estelle v. Gamble,* 429 U.S. 97,106 (1976). "Medical malpractice does not become a constitutional violation merely because

the victim is a **prisoner**." *Estelle,* 429 U.S. at 106.

**i. Serious Medical Condition**

" 'Because society does not expect that **prisoners** will have unqualified access to healthcare,' a **prisoner** must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *see also Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a **prisoner's** condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ") (quoting *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185. Since medical conditions vary in severity, "a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Harrison,* 219 F.3d at 136-37.

Defendants argue that "Plaintiff has not produced any evidence beyond his own subjective complaints to suggest that any of his injuries of October 16, 2006 were so life-threatening or so urgent that they required immediate care beyond that received at the Emergency Room on October 16, 2006." Dkt. No. 42-9 at 12, Defs. Mem. of Law. On the other hand, Benjamin claims that while at Cayuga, he suffered from neck, hip, and back pain, migraine headaches, and difficulty walking and sleeping.[FN8] Compl. at 6. Construing Benjamin's Complaint with great liberality, Benjamin claims that his medical conditions interfered with his everyday life. Benjamin's medical records from the Federal Bureau of Prisons demonstrate that he was still complaining of pain and suffering in 2007, one year after his fall. Dkt. No. 44-2 at 6; *see also id.,* Ex. A.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

FN8. While Benjamin has not submitted an affidavit with his opposition to the **summary judgment** motion, his verified Complaint may be considered an affidavit. See *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit to oppose **summary judgment**."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing **summary judgment**").

**\*7** Depending upon the facts presented, severe back pain, especially if lasting an extended period of time, and migraine headaches may qualify as "serious medical needs" under the Eighth Amendment. *See, e.g., Mendoza v. McGinnis,* No. 05-CV-1124, 2008 WL 4239760 at \*10 & n. 16 (N.D.N.Y. Sept. 11, 2008) ("The question of whether chronic back pain can rise to a level of constitutional significance is dependent upon the circumstances of the particular case presented. In this instance, given plaintiff's diagnosed condition of degenerative disc disease, and resolving all ambiguities in plaintiff's favor, I conclude that a reasonable factfinder could find that the condition constitutes a serious medical need." Moreover, "defendants fail to address plaintiff's migraine headaches, which can also constitute a serious medical need."); *Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at \*6 (N.D.N.Y. Feb. 27, 2008) (holding that severe back pain, especially if long-lasting, can amount to a serious medical need); *Peterson v. Miller,* No. 04-CV-797, 2007 WL 2071743, at \*7 (N.D.N.Y. July 13, 2007) (noting that migraine headaches have "been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for **summary judgment**."); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846, at \*5 (D.Conn. Dec. 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitute a serious medical need.); *Moriarty v. Neubould,* No. 02-CV-1662, 2004 WL 288807, at \*2 n. 2 (D.Conn. Feb. 10, 2004) (holding that plaintiff's migraine headaches could constitute a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating.").

In this instance, Benjamin complained of back pain and migraine headaches for more than a year and his CT scan showed evidence of degenerative disc disease. *See* Cayuga Med. Records; *see also* Tr.; Dkt. No. 42-3 at 18-19. Benjamin stated that the pain interfered with daily activities, such as walking and sleeping. Compl. Defendants have offered nothing, such as an affidavit from Benjamin's treating physician, to refute Benjamin's claims of chronic pain or to lead this Court to conclude that Benjamin's evidence of a serious medical condition is too insubstantial to raise a genuine issue of fact. As stated by the Second Circuit Court of Appeals, an **inmate** should not be required "to demonstrate that he or she experiences pain that is at a limit human ability to bear, nor do we require that his or her condition will degenerate into a life-threatening one." *Brock,* 315 F.3d at 163. Resolving all ambiguities in Benjamin's favor, Benjamin has presented sufficient evidence to allow a reasonable factfinder to conclude that Benjamin's conditions, namely back pain and migraine headaches continuing for an extended period, could rise to the level of serious medical needs.

### ii. Deliberate Indifference

**\*8** Deliberate indifference requires the **prisoner** "to prove that the prison official knew of and disregarded the **prisoner's** serious medical needs." *Chance,* 143 F.3d at 702. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. A prison official acts with deliberate indifference where he "knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citation omitted). Thus, prison officials must intentionally deny treatment or accommodations for medical conditions or intentionally interfere with treatment once prescribed. *Estelle,* 429 U.S. at 104. "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

adequate grounds for a section 1983 claim ." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Indeed, prison officials and medical officers have wide discretion in treating **prisoners**, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons. *Church v. Hegstrom,* 416 F.2d 449, 450-451 (2d Cir.1969). Federal courts are generally hesitant to second guess medical judgments and to constitutional ize claims which sound in state tort law. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that **inmates** be given medical attention that judges would wish to have for themselves.") So strong is this view that determinations of medical providers concerning the care and safety of patients are given a "presumption of correctness." *Perez v. The County of Westchester,* 83 F.Supp.2d 435, 440 (S.D.N.Y.2000) (citing *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996)).

*Sonds,* 151 F.Supp.2d at 311-12.

"Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm." *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (internal quotation marks omitted) (citing *Chance,* 143 F.3d at 703). "The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Thomas,* 288 F.Supp.2d at 339 (internal quotation marks omitted) (citing *Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002)). Even if a **prisoner** is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

**\*9** Benjamin has not established that any of the defendants were deliberately indifferent to his serious medical needs. The record demonstrates that immediately after his fall, staff at Cayuga determined that his injuries warranted

immediate medical attention and he was transported by ambulance to Auburn Memorial Hospital where he was examined and given x-rays and a CT scan. Tr. at 24-25; *see also* Dkt. No. 42-1 (Auburn Memorial Hosp. Med. Records). Upon his return to Cayuga, he was placed in a medical observation cell for several days. Tr. at 26-29; Rule 7.1 Statement, ¶¶ 7, 8. Throughout his stay at Cayuga, he saw a nurse on a daily basis and was never denied his prescribed medication. Tr. at 61-62; Rule 7.1 Statement, ¶ 19. While Benjamin alleges that Wallace only gave him nasal spray when he complained of headaches, he also acknowledged that Wallace had no authority to prescribe medication. Tr. at 50, 58. The record also shows that each time he asked to see Dr. Kooi, the request was granted. Tr. at 55-56. Each time that he saw Dr. Kooi, he was prescribed medication for his pain (*see* Cayuga Med. Records). While Benjamin claimed that Dr. Kooi refused to order an MRI for Benjamin (Tr. at 42-43), Dr. Kooi's decision not to order an MRI does not amount to deliberate indifference. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 505 (S.D.N.Y.2002) ("[w]hether an MRI should have been done is a classic example of a matter for medical judgment as to the appropriate course of treatment and is not actionable under the Eighth Amendment.") (internal quotation marks omitted).

Moreover, the fact that Benjamin wanted different medication than what was prescribed, or that he needed a pillow or extra mattress to ease his pain, also do not state a claim for deliberate medical indifference. A **prisoner** has no right to treatment of his choice and disputes over the proper course of treatment are not actionable under the Eighth Amendment. *See McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988). So long as prison officials act "reasonably," no violation of the Eighth Amendment occurs. *See Salahuddin v. Goord,* 467 F.3d 263, 280-81 (2d Cir.2006).

In other words, Benjamin's medical records and his own testimony confirm that defendants were actively involved in Benjamin's care and were not deliberately indifferent to his needs. Moreover, Benjamin has not alleged or proven that any defendant denied him access to medical care as a form of punishment or to make him suffer. Finally, the Court cannot find, based on the record, that defendants delayed Benjamin's medical treatment. In any event, even if Benjamin could establish that proper medical care was unreasonably delayed, Benjamin has not established that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

any delay in treatment resulted in a deterioration or worsening of any medical condition. *See Thomas,* 288 F.Supp.2d at 339 ("Even if a **prisoner** is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay.") In this case, the record shows that after Benjamin was transferred to federal custody, his complaints and treatment remained essentially the same. Dkt. No. 44-2 at 11-12. In September and December, 2007, Benjamin was examined by medical staff at Moshannon Valley Correctional Center after complaining of lower back pain. *Id.* Benjamin was prescribed Motrin and rest. *Id.*

**\*10** Accordingly, no reasonable fact-finder could conclude that defendants were deliberately indifferent to Benjamin's serious medical needs. Therefore defendants' motion for **summary judgment** should be granted as to Benjamin's medical indifference claims.

### b. Conditions of Confinement Claims

As discussed above, Benjamin's claims that he was subjected to inadequate conditions of confinement are appropriately analyzed under Eighth Amendment standards. *See* subsection II(B)(3) *supra.* The Supreme Court held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer,* 511 U.S. at 832 (quoting *Rhodes v. Chapman,* 452 U.S.337, 349 (1981)). The Eighth Amendment requires that prison officials provide "humane conditions of confinement" including "adequate food, clothing, shelter and medical care." *Farmer,* 511 at 832.

To succeed on a conditions of confinement claim, both an objective and subjective test must be met. First, the deprivation must, from an objective standpoint, be "sufficiently serious." *Farmer,* 511 U.S. at 834. Therefore, a plaintiff must demonstrate that the conditions of confinement fell below the "minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347; *see also Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) ("Ultimately, to establish the objective element of an Eighth Amendment claim, a **prisoner** must prove that the conditions of his confinement violated contemporary standards of decency."). Specifically, a **prisoner** must

prove that he has been deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). The subjective test requires a plaintiff to show that the defendant prison officials imposed the conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996).

In this case, Benjamin alleges that when he returned to Cayuga after his trip to the hospital, he was confined in a medical observation cell for two to three days with a mattress so worn that, it was only one-half to three-quarters of a mattress. Tr. at 27. Benjamin testified that he waited a day before he received a sheet and blanket and he did not have a pillow. Tr. at 28. Benjamin also testified that at some point during his incarceration at Cayuga, he requested an extra mattress and a pillow, but the request was denied. Tr. at 52-53. Finally, Benjamin states that he did not eat two to three meals while in the medical observation cell because he could not reach them without increasing his pain.[FN9]

FN9. In contrast, in his cross-motion for **summary judgment** Benjamin asserts that he did not eat the first meal delivered to him but that "by the time the second meal came around the plaintiff being a human being was at this point hungry, so the plaintiff has to slide himself down to the floor and use his feet in an attempt to slide his food tray over to him which was a long and tedious not to mention painful task." Dkt. No. 44-2 at 3.

Even construing the facts in the light most favorable to Benjamin, this combination of conditions for the period of time alleged does not constitute a deprivation that is sufficiently serious to deny Benjamin the minimal measure of necessities for civilized living nor does it violate contemporary standards of decency. *Bell v. Artuz,* No. 98-CV-4710, 1999 WL 253607, at \*3-4 (S.D.N.Y. Apr. 29, 1999) (holding that no Eighth Amendment claim was stated where **prisoner** alleged poor ventilation, asbestos on catwalk behind cells, no bacterial soap, insufficient lighting, no pillows, and lack of space in cell); *Liles v. Camden County Dept. of Corrections,* 225 F.Supp.2d 450, 458-59 (D.N.J.2002) (holding that allegation that **inmates** receive two sheets and one blanket, but no pillow, does

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

not rise to level of sufficiently serious deprivation to constitute Eighth Amendment violation); *Gutridge v. Chesney,* No. COV.A. 97-3441, 1998 WL 248913, at *1 (E.D.Pa. May 8, 1998) (holding that allegation that **inmate's** blanket was removed for approximately a month and a half failed to state Eighth Amendment claim because **inmate** was not deprived of warmth).

**\*11** Moreover, Benjamin never alleges that his lack of a blanket or sheet for a day deprived him of a human need, such as warmth. There is nothing in the record to demonstrate that Benjamin was denied heat or clothing during the one day that he was without a blanket or sheet. In fact, when questioned at the deposition, Benjamin stated that he did not remember the temperature in the cell on the day he was without a sheet or blanket. Tr. at 28. He remembered only that it was moist, dark, and gloomy. *Id.* Additionally, with respect to Benjamin's claim that he had to sleep on an undersized mattress for two to three days, such a limited duration does not suffice to satisfy the subjective prong of the analysis. *See Suprenant v. Rivas,* 424 F.3d 5, 20 (1st Cir.2005) ("[D]uration may affect the [constitutional] calculus [for conditions of confinement].") (citing *Hutto v. Finney,* 437 U.S. 678, 686-87 (1978) (holding that unpleasant conditions of confinement "might be tolerable for a few days and intolerably cruel for weeks or months.").

The same holds true with respect to the lack of a blanket and sheet for one day. As to Benjamin's claim that he was essentially denied anywhere from one to three meals because he could not reach his tray without suffering pain, this too fails to state a claim of constitutional proportion. "While no court has explicitly held that denial of food is a per se violation of a **prisoner's** Eighth Amendment rights ...., under certain circumstances a **substantial** deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (emphasis added); *see also Waring v. Meachum,* 175 F.Supp.2d 230, 240-41 (D.Conn.2001) (finding no Eighth Amendment claim where **inmates** missed one or two meals and there was no indication that future meals were missed); *cf. Moss v. Ward,* 450 F.Supp. 591, 596-97 (W.D.N.Y.1978) (deprivation of food for four consecutive days held unconstitutional disproportionate punishment for disciplinary violation).

Since Benjamin has not established that he was subject to conditions that would satisfy the objective prong of such a claim, his conditions of confinement claims fail. *See, Brown v. McElroy,* 160 F.Supp.2d 699, 706, n. 4 (S.D.N.Y.2001) (finding that the subjective prong need not be considered when the conditions of confinement alleged are not sufficiently serious). Moreover, even if Benjamin had established a sufficiently serious deprivation for purposes of the Eighth Amendment, he has not established that any defendant acted with a sufficiently culpable state of mind with regard to any deprivation. In fact, there is nothing in the record to demonstrate that any of the defendants personally denied Benjamin meals or bedding, or that they would have had authority to provide those items to Benjamin.

Based on this record, no reasonable fact-finder could conclude that lack of a sheet and blanket for one day, lack of a pillow and extra mattress, or being denied two or three meals would deprive Benjamin of the minimal measures of necessities required for civilized living. Accordingly, defendants' motion should be granted as to the conditions of confinement claims.

### C. Benjamin's Cross-Motion for Summary Judgment

**\*12** Benjamin has cross-moved for **summary judgment**. Dkt. No. 44. Benjamin also tries to revisit this Court's prior decision denying him the right to amend his Complaint to add a negligence claim against Cayuga County. *Id.; see also* Dkt. No. 38 (February 2, 2009 Order). The February 2, 2009 Order denied Benjamin's motion to amend his Complaint to add a claim against Cayuga County for negligence because, among other things, Benjamin had failed to alleged that he had served the requisite notice of claim on Cayuga County as required by New York General Municipal Law § 50-e. *See* February 2, 2009 Order at 4-5.

With respect to his negligence claim Benjamin asserts that water build-up outside of a shower created a foreseeable risk of harm to **inmates** passing through that area and, therefore, the County should compensate him for injuries sustained in a fall resulting from that hazard. Dkt. No. 44. Benjamin asserts that his "injuries resulted from the [negligent] behavior of the prison's authorities because

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

they knew of the existing hazardous conditions due to prior incidents at that exact location and neglected to do anything about it." Dkt. No. 44-2 at 1. Benjamin further claims that his original Complaint demonstrated that he intended to sue Cayuga for injuries suffered as a result of staff negligence and points to the Third Cause of Action in his Complaint, wherein he stated "Plaintiff moves to sue facility for further injuries sustained because of facility's staff negligence." *Id.; see also* Compl. at 5. Benjamin's attempt to have the Court reconsider its February 2, 2009 Order is clearly untimely.[FN10] Nevertheless, in light of Benjamin's *pro se* status, the Court will again address his attempt to assert a claim for negligence against Cayuga County.

> FN10. Local Rule 7.1(g) provides that "a party may file and serve a motion for reconsideration or reargument no later than **FOURTEEN DAYS** after the entry of the challenged judgment, order, or decree." N.D.N.Y.L.R. 7.1(g).

As they did in opposition to Benjamin's motion to amend, defendants argue that Benjamin's state law claims for negligence are futile because he failed to file a notice of claim as is required under New York's General Municipal Law § 50-e. Dkt. No. 45 at 3-4. Defendants also take issue with Benjamin's claim that he intended to also sue Cayuga County, pointing out that Cayuga County was not named as a defendant in Benjamin's complaint. Dkt. No. 45 at 3-4; *see also* Compl.

"As 'a condition precedent' to commencing a tort action against New York municipalities, or any of their officers, agents, or employees, New York General Municipal Law section 50-e requires plaintiffs to file a notice of claim within ninety days after the claim arises." *Olsen v. County of Nassau,* No. CV-05-3623, 2008 WL 4838705, at *1 (E.D.N.Y. Nov. 4, 2008). Accordingly, Benjamin's state law claim for negligence against Cayuga County is futile and he will not be permitted to amend his Complaint to include it. Even if the Court were to liberally construe Benjamin's Complaint as including a claim against Cayuga County for negligence, the claim remains futile.[FN11]

> FN11. Further, to the extent that Benjamin could have sought permission to file a late notice of

claim, he must do so in state court. *See Olsen,* 2008 WL 4838705, at *3 (citing N.Y. Gen. Mun. Law § 50-e(5)(7)).

Moreover, even if Benjamin could establish that he had filed a timely notice of claim, the Court should not exercise pendent jurisdiction over any state law claims. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966)* ( "Certainly, if the federal claims are dismissed before trial, even if not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

*13 As to the medical indifference and conditions of confinement claims, it is recommended herein that judgment be granted to defendants on those claims. *See* subsection II(B)(3) *supra.* For the reasons discussed therein, it is recommended that Benjamin's cross-motion for **summary judgment** be denied in its entirety.

### III. Conclusion.

WHEREFORE, based on the above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for **summary judgment** (Dkt. No. 42) be **GRANTED** and that judgment be entered in favor of all defendants on all claims; and

Benjamin's cross-motion for **summary judgment** (Dkt. No. 44) be **DENIED** in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(d).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

N.D.N.Y.,2010.
Benjamin v. Kooi
Slip Copy, 2010 WL 985844 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 985823 (N.D.N.Y.)

(Cite as: 2010 WL 985823 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Rabindranath BENJAMIN, Plaintiff,
v.
Pang Lay KOOI, Medical Doctor; Carol Wallace, Registered Nurse, Cayuga County Jail; and Jackie Chadwick, Registered Nurse, Cayuga County Jail, Defendants.
No. 9:07-CV-0506 (LEK/DRH).

March 17, 2010.
Rabindranath Benjamin, Philipsburg, PA, pro se.

David H. Walsh, IV, Petrone, Petrone Law Firm, Utica, NY, for Defendants.

### *DECISION ANF ORDER*

LAWRENCE E. KAHN, District Judge.
   **\*1** This matter comes before the Court following a Report-Recommendation filed on February 25, 2010, by the Honorable David R. Homer, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. Dkt. No. 48.
   Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Homer's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

   **ORDERED,** that the Report-Recommendation (Dkt. No. 48) is **APPROVED** and **ADOPTED in its entirety;** and it is further

   **ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

   **ORDERED,** that Plaintiff's Cross-Motion for summary judgment (Dkt.Nos.44) is **DENIED;** and it is further

   **ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) in this action is **DISMISSED** in its entirety; and it is further

   **ORDERED,** that the Clerk serve a copy of this Order on all parties.

   **IT IS SO ORDERED.**

N.D.N.Y.,2010.

Benjamin v. Kooi
Slip Copy, 2010 WL 985823 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

---

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Harold MOODY, Plaintiff,
v.
Dr. Robert F. PICKLES, et al., Defendants.
Civ. Action No. 9:03-CV-850 (DEP).

Sept. 13, 2006.
Menter, Rudin Law Firm[FN1], Steven B. Alderman, Esq.,
Roger Bennett, Esq., Syracuse, NY, for Plaintiff.

> **FN1.** The Menter Rudin firm was assigned to represent the plaintiff in this matter *pro bono*. The court appreciates the extensive energy and effort expended on plaintiff's behalf by the attorneys designated by that firm to handle the case.

Eliot Spitzer, Attorney General, Ed J. Thompson, Esq., Albany, NY, for Defendants.

*DECISION AND ORDER*

DAVID E. PEEBLES, Magistrate Judge.

**\*1** Plaintiff Harold Moody, a former New York State prison inmate who until recently was proceeding *pro se* and *in forma pauperis* but is now represented by *pro bono* counsel, commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his constitutional rights. Plaintiff's claims, as narrowed by earlier decisions from this court, include a cause of action alleging deliberate indifference to his serious medical needs by virtue of a failure by one of the defendants to follow instructives from a medical colleague to order magnetic resonance imaging ("MRI") testing of Moody's knee and place him in the prison infirmary, in violation of his Eighth Amendment rights, and his assertion that defendants' ongoing failure to properly treat his knee condition was motivated out of retaliatory animus based upon complaints registered regarding his treatment, thus infringing upon his First Amendment rights.

A non-jury trial was held before me in connection with this action on August 14, 2006.[FN2] This decision represents my findings of fact and conclusions of law, based upon the evidence adduced during that trial.

> **FN2.** The parties have consented to my jurisdiction to address the dispositive aspects of the case, pursuant to 28 U.S.C. § 636(c). *See* Dkt. No. 61. Additionally, although jury demands were initially filed by both sides, the parties later stipulated to a bench trial. Dkt. No. 65. These agreements by the parties were confirmed on the record at the outset of the trial.

*I. BACKGROUND*

At the times relevant to his claims, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's incarceration stemmed from a conviction for weapons possession and attempted robbery, resulting in the imposition of a determinate, ten year sentence.

On December 21, 2002, while confined within the Oneida Correctional Facility ("Oneida"), Moody was seen by a nurse at the facility's infirmary, complaining of a right knee injury suffered when standing up from his dormitory room bed on the previous day. Although plaintiff reported experiencing both discomfort and swelling, no swelling, bruising or discoloration was observed by the nurse during that visit. Following an examination of his knee, plaintiff was given an Ace wrap and a one day excuse from mess hall duty, and was instructed to sign up for sick call on December 23, 2002.

Plaintiff returned to the clinic, as instructed, on December 23, 2002 and was seen by another nurse on that occasion. Once again, no swelling was discerned during the course of that visit. Plaintiff was advised by the examining nurse to rest and apply ice to his knee, and was given a work excuse for the day as well as an analgesic balm, to be applied as needed.[FN3]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

FN3. It was also noted in an entry from that date recorded in plaintiff's Ambulatory Health Record ("AHR"), a compilation of medical records maintained by the DOCS with respect to each inmate, that Moody was already on Motrin, which had been prescribed on October 28, 2002 for unrelated pain symptoms.

Although the records are somewhat equivocal on this score, in that there is no record of the visit, it appears based upon a subsequent AHR entry that plaintiff was taken to the prison clinic by van for treatment of his knee on December 25, 2002. On that date, plaintiff was advised to continue using ice and taking Motrin, and to elevate his knee, but was told that there was nothing more that could be done until his condition was evaluated by a doctor.

Plaintiff was next seen at the Oneida infirmary for his right knee condition on January 2, 2003, again by a registered nurse. During her examination the nurse observed some swelling of the inner aspect of plaintiff's right knee, as well as tenderness in the patella region. An x-ray of plaintiff's knee was ordered, and he was given an elastic knee support and permit for its use until April 2, 2003. Moody was also advised during that session to apply ice or warm, moist soaks, and was again provided with an analgesic balm to apply as needed. FN4 Plaintiff was advised during that visit to return to the clinic as needed for further treatment.

FN4. It was again noted in the entry regarding that visit that plaintiff had a prescription from October 28, 2002 for Motrin 600 mg.

*2 An x-ray was taken on January 2, 2003 of plaintiff's right knee. The results of that x-ray reflected that "[b]ones and joints are within normal limits. There is no joint effusion."

On January 14, 2003, Moody was seen at the Oneida clinic by defendant Gloria Janicki, a nurse practitioner. At the time Janicki, together with two DOCS physicians, Dr. Robert F. Pickles and Dr. Raja Mara, were assigned primary responsibility to see and treat inmates at Oneida with medical conditions. Those duties were apportioned among Dr. Mara, Dr. Pickles and Nurse Practitioner Janicki based upon the days of the week, with Dr. Pickles generally on duty on Tuesdays and Wednesdays, and defendant Janicki ordinarily covering Thursdays and Fridays.

After experiencing some difficulty in performing the requisite tests on plaintiff's right knee, as a result of Moody's weight, Nurse Practitioner Janicki requested that Dr. Pickles assist in the examination. FN5 During his brief examination of plaintiff's knee on that occasion, Dr. Pickles observed some positive valgus stress, and noted that medial collateral ligament strain should be ruled out. Following the examination plaintiff was again provided with an Ace wrap and knee brace, as well as a cane for ambulation, and was excused from participation in programs. Plaintiff was advised to return to the clinic in one week, and an appointment for January 21, 2003 was accordingly scheduled.

FN5. At the time of that examination, plaintiff weighed nearly 300 pounds.

Central to plaintiff's claims is his contention that he was a patient of Dr. Pickles, who during the January 14, 2003 examination directed Nurse Practitioner Janicki to order immediate MRI testing of plaintiff's knee, and to place him in the infirmary in order to immobilize the affected knee. FN6 Having considered carefully the testimony of Nurse Practitioner Janicki and Dr. Pickles, as well as that of the plaintiff, I find that both during and following that examination, plaintiff was regarded as defendant Janicki's patient. In addition, I find that no such directions were given by Dr. Pickles during that brief session. As Dr. Pickles explained, an MRI is an expensive procedure which he would order done only if surgical intervention were warranted. According to Dr. Pickles, surgery, in turn, would only be considered by him as a treatment option in the event of immobility of the knee, something which the doctor did not observe in the plaintiff's case. Given these circumstances, and the finding that Dr. Pickles regarded Moody as defendant Janicki's patient, I reject as implausible plaintiff's contention that those two instructives were given by Dr. Pickles on January 14, 2003, as alleged.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

FN6. The fact that January 14, 2003 was a Tuesday is to some degree supportive of plaintiff's contention that he was a patient of Dr. Pickles, rather than of Nurse Practitioner Janicki, a claim which is somewhat pivotal to his deliberate indifference cause of action. No explanation appears in the record, however, of the need for defendant Janicki's involvement in plaintiff's examination, if that were the case, given the system in place at the facility's infirmary. Dr. Pickles also noted that although she is a nurse practitioner and he is a physician, he views defendant Janicki as a co-equal rather than considering himself as her superior when it comes to treating patients, adding that his assistance was elicited in plaintiff's case solely as a result of Nurse Practitioner Janicki's inability to perform the requisite testing due to plaintiff's size and weight.

Although there is no AHR entry for this date, it appears that plaintiff returned to the clinic, as directed, on January 21, 2003, continuing to complain of knee pain, and again was seen by Nurse Practitioner Janicki. While plaintiff contends that he also saw Dr. Pickles on that occasion, Dr. Pickles recalls seeing the plaintiff only once, and there is no written record to support this contention .FN7 During that visit, plaintiff complained of experiencing continued difficulties, including with respect to walking and climbing stairs, and asked to be excused from his mess hall work assignment. Plaintiff's request for a work excuse was denied by Nurse Practitioner Janicki, due in part to the fact the he was able to ambulate through use of a cane.

FN7. Since plaintiff saw Nurse Practitioner Janicki on that date, and no reason has been offered or appears from plaintiff's records for another consultation with Dr. Pickles at the time, I do not credit plaintiff's statements in this regard.

*3 On February 22, 2003 plaintiff was seen by a registered nurse at the Oneida clinic after having reportedly slipped on water on the mess hall floor and fallen, twisting his right knee. The examining nurse noted that plaintiff already had been provided with a knee

support and a cane permit, and that an MRI was scheduled for plaintiff's knee on February 24, 2003. A report of the injury was completed and filed, and plaintiff was given a work excuse through February 25, 2003.

On February 24, 2003, plaintiff underwent an MRI examination of his right knee, conducted by After-Hours Mobile Imaging, located in Hunt, New York. FN8 That MRI revealed some moderate joint effusion, a medial meniscal tear involving body/posterior horn, and some bone contusion of the medial tibial plateau.

FN8. It is unclear from the record where the MRI was administered. Dr. Pickles stated that while there is an x-ray machine in Oneida, the facility does not have MRI capabilities. During his testimony Dr. Pickles noted his belief that in 2003 there was MRI testing equipment located in the Walsh Regional Medical Center, within the Marcy Correctional Facility and adjacent to Oneida. The report completed by Dr. Victor Regenbogen regarding plaintiff's MRI, however, fails to disclose where the testing was administered.

Plaintiff was seen on February 25, 2003 by Nurse Practitioner Janicki, principally for a skin condition. In her AHR entry relating to that visit, defendant Janicki noted that plaintiff had undergone an MRI of his right knee, and was scheduled for an orthopedic consultation concerning his knee, and that Moody reported that he "tires of any long distance walking." A request for orthopedic consultation was submitted by Nurse Practitioner Janicki to appropriate DOCS personnel on February 25, 2003.

On April 2, 2003 plaintiff was again seen by Nurse Practitioner Janicki for complaints associated with his right knee condition. On that date, plaintiff for the first time reported experiencing throbbing pain at night.FN9 As a result of that complaint plaintiff was placed in the prison infirmary, and corrections officers were dispatched to Moody's dormitory to retrieve his medications, including the previously-prescribed Motrin.FN10 Plaintiff was again seen by Nurse Practitioner Janicki on April 11, 2003, complaining of continued throbbing pain in certain positions. During that examination, plaintiff expressed a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

desire to leave the infirmary, but was nonetheless kept there in light of his pain complaints.

> FN9. Nurse Practitioner Janicki's AHR entry from that date characterizes this as a new development, noting that plaintiff's previous complaints involved pain experienced when walking for any distances.

> FN10. Although his AHR does not reflect this fact, according to the plaintiff he was admitted into the Oneida infirmary on March 28, 2003.

Plaintiff was examined by Dr. Thomas Smallman, an orthopedic consultant, on April 16, 2003. Based upon his examination Dr. Smallman diagnosed plaintiff as suffering from a medial meniscus tear, and recommended that he undergo arthroscopic surgery to repair the damage.

Plaintiff was next seen at the clinic for his knee condition by Nurse Janicki on April 18, 2003. At that time, Moody appeared to be ambulating without difficulty and related that he could walk for short periods without experiencing problems, and that it was only when he walked long distances that his knee bothered him. Nurse Practitioner Janicki noted in her AHR entry from that date that plaintiff was not any longer using his cane.

Plaintiff was again seen by Nurse Practitioner Janicki on April 21, 2003, asking that he be allowed to return to the general population. During that visit plaintiff reported feeling good and not experiencing pain, and stated that he was able to ambulate with no difficulty, and without the use of a cane. It was noted in the AHR entry from that date that plaintiff requested transfer into a "flat facility" which would obviate the need to use stairs.[FN11] Reports of subsequent visits by plaintiff to see medical personnel at Oneida on April 25, 27, and 30, 2003, as well as on May 5, 2003, make no mention of plaintiff's knee condition.

> FN11. Plaintiff was subsequently transferred into the Marcy Correctional Facility, a single level prison, on or about May 7, 2003.

*4 Arthroscopic surgery was subsequently performed by Dr. Smallman at the State University of New York at

Upstate, located in Syracuse, New York, on May 27, 2003 to repair plaintiff's knee. There is no indication from the testimony adduced at trial or in his medical records that plaintiff's condition worsened, or that the surgery was made more difficult, as a result of the intervening period between December 21, 2002, when Moody first reported his symptoms, and the date upon which the operation was performed.

Over the course of time plaintiff expressed concerns and registered complaints with various prison officials, both directly and through the established grievance process, concerning his medical treatment.[FN12] On February 20, 2003 plaintiff filed a grievance with the facility's inmate grievance review committee ("IGRC") complaining of the delay in receiving an MRI and the failure of prison officials to provide him with adequate treatment for his knee injury. Following an investigation, that grievance was accepted in part by the facility superintendent, who on February 26, 2003 noted that plaintiff had received an MRI two days previously and was "receiving appropriate care." That determination was affirmed on appeal to the Central Office Review Committee ("CORC") on April 23, 2003, with a notation that the plaintiff had been referred for surgery on his knee, concluding that plaintiff's "medical concerns had been addressed by medical staff."

> FN12. Some of those complaints also addressed alleged harassment of the plaintiff by defendant Moon, who has been identified by Moody as a nurse administrator at the facility. Since judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure was entered at the close of plaintiff's case dismissing Moody's claims against defendant Moon, those allegations will not be described or addressed in this decision.

On February 24, 2003, shortly before receiving the superintendent's response to his grievance, plaintiff wrote to defendant Peter Behrle, who at the time was the Deputy Superintendent for Administration of Oneida, complaining of the delay in receiving treatment.[FN13] Copies of that letter were forwarded by the plaintiff to Nurse Administrator Moon and Dr. Mara, a physician at the facility. In

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

response to his letter, Deputy Superintendent Behrle wrote to the plaintiff on March 3, 2003 noting that an MRI had been completed on February 24, 2003, and that upon receipt of its results his situation would be reviewed with him by a physician.

> FN13. Defendant Behrle has since been promoted, and is currently the superintendent at another DOCS prison facility.

Plaintiff again wrote to Deputy Superintendent Behrle on March 23, 2003, inquiring about delays in being seen by a doctor or nurse practitioner following a request for such an appointment, and additionally on March 26, 2003, pointing out that although it had been three and one-half weeks since his MRI was administered, he had yet to be apprised of the results.[FN14] Deputy Superintendent Behrle responded to plaintiff's letters of March 23, 2003 and March 26, 2003, pointing out that Moody was scheduled to be seen by an orthopedic specialist in April of 2003 to review his MRI test results and discuss the issue of what, if any, additional treatment was required, noting that in the interim plaintiff had been temporarily placed in the infirmary and was receiving appropriate care.

> FN14. During her testimony, Nurse Practitioner Janicki candidly stated that she has voiced concerns over the length of time it customarily takes to receive reports back of such MRI testing.

A second inmate grievance was filed by Moody on April 2, 2003, addressing the delay in receiving testing and treatment for his knee condition. That grievance was denied by the facility superintendent, who in his response noted that discretion is used by medical personnel in the scheduling of appointments, and that the interval between the date of plaintiff's initial visit and his scheduled appointment with Nurse Practitioner Janicki on January 14, 2003 "was appropriate and within the acceptable timeframes given assessment at that time." That determination was upheld on appeal by decision rendered by the CORC on May 21, 2003.

**\*5** On April 7, 2003, plaintiff authored yet another letter to Deputy Superintendent Behrle, continuing to complain of the delay in receiving treatment and requesting that he not be placed into general population. That letter was referred to the facility's Deputy Superintendent for Programs, W.F. Hulihan, who on April 9, 2003, responded, noting that plaintiff was scheduled to go to a clinic for treatment "in the near future" and that according to medical staff he would be permitted to remain in the infirmary until then, and consequently would not be required to participate in prison programs.

## II. DISCUSSION

As the result of the issuance by me of a report and recommendation dated January 23, 2006, Dkt. No. 47, and its acceptance by Chief District Judge Norman A. Mordue on February 14, 2006, Dkt. No. 48, as well as the entry of judgment as a matter of law at trial dismissing all claims asserted by the plaintiff against Nurse Administrator Moon, the remaining issues in the case surround Nurse Practitioner Janicki's alleged refusal to comply with directives of Dr. Pickles, on January 14, 2003 and again on January 21, 2003, to order an immediate MRI and place the plaintiff in the infirmary, and claims of retaliation by Nurse Practitioner Janicki in response to complaints lodged by the plaintiff regarding her conduct. Also implicated are plaintiff's claims against Deputy Superintendent Behrle, based principally upon his failure to intercede and prevent those constitutional violations, despite his awareness of them.[FN15]

> FN15. In their summary judgment motion defendants argued that dismissal of plaintiff's claims was warranted based upon his failure to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), before commencing this action. See 42 U.S.C. § 1997e(a). The portion of defendants' summary judgment motion seeking dismissal on this basis was denied in light of the court's finding of the existence of triable issues of material fact regarding the defense. At trial defendants did not press their argument regarding plaintiff's alleged failure to exhaust. In any event, it appears from the evidence adduced that plaintiff did satisfy his obligation under the PLRA to fully exhaust his claims, and this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

defense is therefore rejected.

A. *Deliberate Indifference*

Plaintiff's medical indifference claim is appropriately analyzed against the backdrop of a body of well-established Eighth Amendment jurisprudence. The Eighth Amendment proscribes the imposition of cruel and unusual punishments, including those that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia,* Estelle). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

1. *Serious Physical Injury*

**\*6** In order to prove an Eighth Amendment violation based upon indifference to an inmate's medical requirements, a plaintiff must establish a deprivation involving a medical need which is, in objective terms, "'sufficiently serious'". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance*). Relevant factors in making this determination include injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that "'significantly affects'" a prisoner's daily activities, or causes "'chronic and substantial pain.'" *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-*3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

The medical condition at issue in this case consists of a knee injury diagnosed principally as medial meniscal tear, with joint effusion. There is no evidence that as a result of the injury plaintiff's knee was rendered immobile, and in fact the evidence establishes that, to the contrary, plaintiff was able to ambulate, both with and without a cane at various times, despite his injury.

To the extent that plaintiff claims to have suffered "excruciating pain" as a result of his injury, such claims are not supported by the chronology of events and the relevant entries in his prison health records. While it is clear that plaintiff did complain of knee pain, his injury was not immobilizing, and his visits to the Oneida clinic with complaints of knee pain were sporadic, with intervals of up to one month or more between some of those visits. Indeed, plaintiff's AHR reflects several visits by him to the clinic during the relevant time frame complaining of other conditions, with no mention of his knee, even in passing. *See, e.g.,* AHR entries dated 1/13/03 (dandruff), 1/16/03

Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

(medication renewal), 2/18/03 (stuffy nose), 4/14/03 (ear pain), and 4/15/03 (skin condition).

While, undoubtedly, plaintiff's knee injury caused him some modicum of pain, for which he was provided treatment, albeit conservative at the outset, and medication, the proof fails to establish the existence of a serious physical condition of constitutional proportion. In that regard, I note that courts in this circuit have almost uniformly found similar knee injuries to be insufficient to trigger Eighth Amendment protection and to support a deliberate indifference claim. *See, e.g., Williamson v. Goord,* No. 9:02-CV00521, 2006 WL 1977438, at *9-* 16 (N.D.N.Y. July 11, 2006) (Sharpe, J. & Lowe, M.J.) (plaintiff's injuries, including arthrosis, degenerative joint disease in both knees, and a partially torn anterior cruciate ligament did not impose the risk of death or degeneration, or inflict severe pain, sufficient to satisfy the serious medical condition test); *Taylor v. Kurtz,* No. 00-CV-700, 2004 WL 2414847, at *1-*4 (W.D.N.Y. Oct. 28, 2004) (where plaintiff complained of failure to perform knee surgery until nine months after discovering the tear of a previously repaired anterior cruciate ligament, a torn lateral meniscus, and degenerative arthritis, plaintiff's injury found not to be sufficiently serious to satisfy the Eighth Amendment standard); *Espinal v. Coughlin,* No. 98 CIV. 2579, 2002 WL 10450, at *1-*5 (S.D.N.Y. Jan. 3, 2002) (ruptured anterior cruciate ligament did not constitute severe injury for purposes of the Eighth Amendment despite a three year delay in performing surgery while more conservative treatment was attempted); *see also Culp v. Koenigsmann,* No. 99 Civ. 9557, 2000 WL 995495, at *4, *9-*10 (S.D.N.Y. July 19, 2000) (no Eighth Amendment violation where plaintiff suffered from a torn medial meniscus and experienced a one-year delay from injury to surgery).

**\*7** Since the proof at trial failed both to distinguished plaintiff's knee condition from those found by this and other courts not to trigger Eighth Amendment protection, and to establish that his injury imposed risk of death or degeneration, or resulted in severe pain, I find that Moody did not suffer from a constitutionally significant serious physical need. Plaintiff's deliberate indifference claim is therefore subject to dismissal on this basis.

### 2. *Deliberate Indifference*

In addition to demonstrating the existence of a serious physical need, to prevail on his medical indifference claim plaintiff must additionally establish that defendants were deliberately indifferent to that condition. Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

It is well established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff contends that deliberate indifference has been established based upon proof of Nurse Practitioner Janicki's intentional disregard for his medical condition, manifested by his failure to follow instructives of Dr. Pickles issued on January 14, 2003 and again, he contends, on January 21, 2003, that immediate MRI testing of his right knee be conducted and that he be placed in the prison infirmary. In this regard I credit the testimony of Dr. Pickles and Nurse Practitioner Janicki, to the effect that an MRI was not ordered on January 14, 2003, nor did Dr. Pickles instruct Nurse Practitioner Janicki on that or any other occasion to place Moody in the infirmary. Dr. Pickles testified to the expense associated with an MRI and his practice not to order such testing when there is no knee immobilization noted and

Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

immediate surgical intervention was not contemplated. Dr. Pickles also convincingly testified that he would not have given such instructives to Nurse Practitioner Janicki since, although she has less medical training than a prison physician, he regarded her as a colleague and that the plaintiff was her patient, noting that he was asked to examine Moody only because of the difficulty which defendant Janicki was experiencing in administering the appropriate testing.

**\*8** I also accept the testimony of Dr. Pickles and Nurse Practitioner Janicki, which reflects their professional beliefs that resort to the more conservative course of treatment initially offered to the plaintiff was a reasonably prudent first step. During that interim period leading up to Moody's surgery a non-invasive approach was taken to address his knee condition, and he was provided with Ace wraps, an elastic knee brace, pain medication, and a cane to assist him to ambulate. When ambulation became difficult plaintiff was placed in the prison infirmary, and taken off his work assignment and other prison programming. Finally, when it was determined that plaintiff's condition had not improved appreciably despite those measures, an orthopedic consultation was ordered, and surgery was ultimately performed.

The court has carefully considered the chronology of relevant events and the delay in providing MRI testing and surgical intervention. Delays and interruptions in medical treatment of an inmate's medical condition, however, do not necessarily provide a basis for an Eighth Amendment claim. *See Smith v. Carpenter,* 316 F.3d 178, 184-87 (2d Cir.2003). Where a plaintiff complains of delays or interruptions in providing needed medical treatment, the court should consider the severity of the "challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone" in determining whether plaintiff has shown the existence of a sufficiently serious medical need. *Smith,* 316 F.3d at 185 (emphasis in original). Although a delay or interruption in medical care may amount to deliberate indifference, the Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a "life-threatening and fast-degenerating" condition for three days, or delayed

major surgery for over two years. *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990); *Hathaway,* 841 F.2d at 50-51; *Archer v. Dutcher,* 733 F.2d 14, 16-17 (2d Cir.1984).* The evidence presented at trial, fell well short of meeting this requirement.

In sum, even had plaintiff been able to establish the existence of a serious medical condition of constitutional significance, the evidence at trial failed to establish that either Nurse Practitioner Janicki or Dr. Pickles was deliberately indifferent to plaintiff's condition. And, since plaintiff's deliberate indifference claims against defendant Behrle hinge upon proof of indifference on the part of one or both of those defendants and his failure to intercede, Moody's claims against him are also subject to dismissal.

B. *Retaliation*

Although not containing a discrete cause of action denominated as such, I have generously construed plaintiff's complaint, and in particular its reference to the First Amendment, to include a claim of unlawful retaliation. To the extent that that retaliation claim is asserted based upon actions taken by defendant Moon, that portion of it has been dismissed. The remaining element of that claim relates to Nurse Practitioner Janicki's alleged refusal to provide plaintiff with requested treatment for his knee in retaliation for his having registered complaints regarding her care and treatment.

**\*9** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)

(Cite as: 2006 WL 2645124 (N.D.N.Y.))

upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

While it is clear that Moody did complain of treatment rendered by defendant Janicki, and thus engaged in activity protected by the First Amendment, *Graham,* 89 F.3d at 80, the trial record contains no evidence of any adverse actions taken by Nurse Practitioner Janicki against the plaintiff as a result of his complaints. Instead, at trial defendants convincingly established that Moody received the care and treatment which would have obtained, regardless of whether or not such complaints were registered. Under these circumstances, I find that plaintiff has not demonstrated the existence of retaliation by a fair preponderance of the evidence, and that in any event defendant Janicki has carried her burden of proving that regardless of any retaliatory animus he received the same treatment as would have been provided even absent such motivation.

III. *SUMMARY AND CONCLUSION*

Based upon the evidence at trial I find that plaintiff has failed to carry his burden of demonstrating either the existence of a serious medical need or deliberate indifference on the part of the remaining defendants in the action to any such need, and therefore will direct dismissal of plaintiff's Eighth Amendment deliberate indifference claim. Similarly, I find no basis to conclude that adverse action was taken against the plaintiff by Nurse Practitioner Janicki based upon plaintiff's complaints regarding her care and treatment of his knee, and therefore will order dismissal of plaintiff's retaliation claim as well.

Based upon the foregoing it is hereby

ORDERED, that the clerk enter judgment in defendants' favor DISMISSING plaintiff's remaining claims in all respects.

N.D.N.Y.,2006.

Moody v. Pickles
Not Reported in F.Supp.2d, 2006 WL 2645124 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Anthony GILLESPIE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.
No. 9:08-CV-1339 (TJM/ATB).

Feb. 22, 2010.

Anthony Gillespie, pro se.

Michael McCartin, AAG, for Defendant.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

*1 This matter has been referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge. The case was recently re-assigned from Magistrate Judge George H. Lowe to this court.

In this civil rights complaint, plaintiff alleges that four individual defendants employed by the New York State Department of Correctional Services ("DOCS") denied him adequate medical care, in violation of the Eighth Amendment, while plaintiff was an inmate in the custody of the Mid-State Correctional Facility ("Mid-State") in 2008. (Dkt. No. 1). The complaint also makes passing references to the alleged violation of his rights under the "Patient's Bill of Rights" and the "Disability Act." Plaintiff seeks substantial monetary damages and other relief.

Presently before this court is the defendants's motion to dismiss the complaint for failure to state a viable claim, pursuant to FED.R.CIV.P. 12(b)(6). (Dkt. No. 21).

Plaintiff filed a responsive affidavit and memorandum of law. (Dkt. No. 27). For the following reasons, this court recommends that the plaintiff's complaint be dismissed, without prejudice, in its entirety.

**DISCUSSION**

**I.** *Facts and Procedural History*

Plaintiff was transferred to Mid-State in early April 2008.[FN1] On April 24, 2008, plaintiff saw defendant Manava, a DOCS physician at Mid-State, and complained of lower back pain due to osteoarthritis. Plaintiff requested certain modes of treatment and medical orders that he had received at various prior times in other DOCS facilities-a "back brace, physical therapy, a permit for no lifting of over 25 pounds, no sitting for over 25 minutes, bottom bunk permit, light duty," and an outside consultation for an MRI. (Complaint ¶¶ 14-16). Dr. Manava examined plaintiff and observed that he had no trouble walking, bending, or doing daily chores and that he had no deformity or prior injury. Dr. Manava referred to prior X-rays of plaintiff and concluded that an MRI was not required. He also determined that plaintiff did not meet the requirements for assignment to a bottom bunk.[FN2] Dr. Manava continued plaintiff's prescription for Naproxen and recommended that he do stretching exercises. (Ex. A, Dkt. No. 1-2 at 2).

FN1. Plaintiff referenced in his complaint attached DOCS Ambulatory Health Records ("AHRs") and other DOCS medical records, as well as documentation of his extensive complaints and grievances to DOCS regarding his medical care in 2008. (Exs.A-P, Dkt. No. 1-2). These exhibits to the complaint are referenced in outlining the facts set forth herein.

FN2. In various attachments to the complaint, plaintiff attempts to document that Dr. Manava's denial of a bottom bunk restriction was contrary to DOCS Health Care Services Policy No. 1.49, which includes, among the criteria for placement in a lower bunk, a "permanent physical disability, ... *e.g.* rheumatoid arthritis." (Ex. A,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

Dkt. No. 1-2 at 4; Ex. C, Dkt. No. 1-2 at 21-22). While it is unnecessary to discuss the differences between these two forms of arthritis in connection with this motion, it is commonly understood that they are significantly different conditions and that rheumatoid arthritis is typically more disabling than osteoarthritis. *See, e.g.,* MedLinePlus website, a service of the U.S. National Library of Medicine and the National Institutes of Health: http://www.nlm.nih.gov/medlineplus/ency/article/000431.htm (rheumatoid arthritis) and http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm (osteoarthritis).

Over the next three months, plaintiff wrote a series of complaints and formal grievances [FN3] to various DOCS officials complaining of Dr. Manava's failure to order the types of treatment and accommodations that he had previously enjoyed at other DOCS facilities. On April 24, 2008, plaintiff wrote a letter to defendant Harris, a Nurse Administrator at Mid-State, who replied, the next day, that she could not override the medical decisions of a treating physician. (Complaint ¶ 18-19; Ex. C, Dkt. No. 1-2 at 21-23).

FN3. The court will discuss the various letters to named defendants which form the bases for plaintiff's allegations that they violated his Eighth Amendment rights. It is not necessary to detail the several formal grievances which the plaintiff also submitted during the same time period in 2008. Defendants' motion does not assert that the plaintiff failed to exhaust his administrative remedies; and plaintiff documents that he pursued and appealed formal grievances. In response to the grievances, DOCS consistently upheld the decisions of its medical staff, but did recommend that plaintiff continue to pursue his medical issues through sick call at the facility. DOCS also offered plaintiff the option to seek an outside medical opinion at his own expense. (Complaint, ¶¶ 20, 24-27, 36; Exs. D, G-H, O-P)

On May 8, 2008, plaintiff sent a letter of complaint about Dr. Manava and Nurse Administrator Harris to

defendant Ramineni, the Facilities Health Services Director at Mid-State, but received no reply. (Complaint ¶ 21; Ex. E, Dkt. No. 1-2 at 32-34). Plaintiff penned another letter on May 18th to Dr. Ramineni, who replied two days later, stating that he had reviewed the plaintiff's chart and determined there was no medical basis for plaintiff's various requests for particular modes of treatment. (Complaint ¶¶ 22-23; Ex. F, Dkt. No. 1-2 at 36-37). On May 21, 2008, plaintiff wrote a short note to Dr. Ramineni, asking him to reconsider his prior decision, to which no reply was received. (Ex. F, Dkt. No. 1-2 at 38).

**\*2** On June 3, 2009, plaintiff wrote a letter repeating the complaints about his medical treatment at Mid-State to defendant Wright, the Chief Medical Officer of DOCS. (Complaint ¶ 28; Ex. I, Dkt. No. 1-2 at 49-51). Dr. Wright referred the letter to Regional Health Services Administrator ("RHSA") Pedro Diaz. By letter dated June 11th, RHSA Diaz summarized the course of plaintiff's prior treatment, advised that the facility physician was the final arbiter of medical decisions regarding plaintiff's care, and concluded that plaintiff's allegation that his health care needs were not being met were unsubstantiated. (Complaint ¶ 29; Ex. J, Dkt. No. 1-2 at 54). Plaintiff directed his next letter of complaint to Brian Fischer, the DOCS Commissioner who is not named in this action. Commissioner Fischer referred the letter to Dr. Wright who responded using language similar to the prior letter of RHSA Diaz. (Complaint ¶ ¶ 30-31; Ex. K & I, Dkt. No. 1-2 at 55-59). Dr. Wright and his staff repeatedly urged the plaintiff to address his health care issues using existing sick call procedures at the facility.

On July 22, 2008, plaintiff was again examined at Mid-State by Dr. Manava. The complaint alleges that plaintiff again mentioned his lower-back arthritis and complained that Naproxen was not helping meet "his medical needs." Plaintiff claims that Dr. Manava found nothing wrong with plaintiff's back and denied his requests for assistance. (Complaint ¶¶ 34-35). The AHR attached to the complaint reflects that the plaintiff complained of lower back pain and stiffness and stated that he had run out of Naproxen. Dr. Manava noted that plaintiff's prior X-rays confirmed mild degenerative osteoarthritis, but were otherwise normal. His examination indicated that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

plaintiff had no deformity and a full range of motion. He refilled plaintiff's Naproxen prescription and suggested that he use certain exercises and hot water showers to help address his symptoms. (Ex. B, Dkt. No. 1-2 at 14). Although not referenced in the complaint, the attached medical records indicate that plaintiff was also seen by the medical staff at Mid-State regarding his back and other health issues twice in August 2008. (Ex. B, Dkt. No. 1-2 at 14-15).

Plaintiff filed his complaint on December 12, 2008, naming the four defendants referenced above, as well as DOCS and "John/Jane Does 1-50 (DOCS) supervisory, training and policy personnel." The District Court denied plaintiff's request for class certification, dismissed DOCS as a defendant, and directed plaintiff to take reasonable steps to identify the John/Jane Doe Defendants. (Dkt. Nos.4, 6). Ultimately, the plaintiff advised that he intended to proceed only against the four originally-named individual defendants, and the District Court dismissed the action against all other defendants. (Dkt.Nos.16, 18).

The complaint appears to name defendants Wright, Harris, Ramineni, and Manava in both their official and individual capacities, and this court recommends that the action be dismissed to the extent it purports to sue these defendants in their official capacities for damages.[FN4] The complaint will be evaluated assuming that it makes claims against the DOCS defendants only in their individual capacities.

FN4. It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (*citing Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted). To the extent that the DOCS defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson,* 251 F.3d 65, 69-70 (2d Cir.2001); *Posr v. Court Officer*

*Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

## II. *Motion to Dismiss*

*3 Defendants move to dismiss the complaint, arguing (1) that plaintiff cannot establish an Eighth Amendment claim because he cannot show that he suffered from a "serious" medical condition and because he is alleging mere disagreement with the medical judgment of DOCS physicians regarding appropriate treatment; (2) that Nurse Administrator Harris's deference to the medical decision of a prison physician cannot constitute "deliberate indifference"; (3) that defendants Wright and Ramineni were not personally involved in plaintiff's medical care and cannot be liable under Section 1983; and (4) that all of the defendants are entitled to qualified immunity. This court concludes that plaintiff has failed to allege a viable claim that his disagreement with the medical decisions of DOCS physicians constituted deliberate indifference to his medical needs. The complaint's passing reference to the Patients' Bill of Rights and the Americans with Disability Act also do not state a claim upon which relief can be granted. Accordingly, this court recommends that the complaint be dismissed in its entirety, without prejudice.

## A. Legal Standard for Motion to Dismiss

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp., 550 U.S. at 555).* Plaintiff's factual allegations must also be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, in the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted). In this case, plaintiff has attached various exhibits to the complaint that the court has considered in making its ruling on defendants' motion.

**B. Inadequate Medical Care**

**1. Legal Standards**

*4 In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

**a. Objective Element**

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . (citing *Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases where the alleged inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

**b. Subjective Element**

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

*\*5* In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.* Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**2. Application of Legal Standards**

Defendants argue that plaintiff has failed to allege that he suffered from a sufficiently "serious" medical condition to satisfy the objective element of the Eighth Amendment

standards for medical care. Noticeably missing in plaintiff's complaint are any factual allegations indicating that his degenerative osteoarthritis of his lower back constituted a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996). The medical records attached to the complaint document that, over a period of three years, plaintiff periodically claimed to suffer pain, variously described as "intermittent," "chronic," "increasing"; but he only once used the term "severe" and never used other adjectives such as "extreme," "excruciating," or "unbearable." (Dkt. No. 1-2 at 8-15, 34, 42). It is extremely questionable that plaintiff has alleged a medical condition that is sufficiently serious for the purposes of the Eighth Amendment. *See, e.g., Veloz v. New York,* 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *Taylor v. Kurtz,* 00-CV-0700, 2004 WL 2414847 at \*2, \*3-\*4, 2004 U.S. Dist. LEXIS 27925 (W.D.N.Y. Oct.28, 2004) (prisoner's degenerative arthritic knee condition did not constitute a serious medical need); *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Phillips v. Goord,* 08-CV-0957, 2009 WL 909593 at \*6, 2009 U.S. Dist. LEXIS 29322 (W.D.N.Y. Apr.1, 2009) (allegations of "chronic" back pain do not support a claim that plaintiff had a "serious" medical condition).

*\*6* In any event, plaintiff's complaints about his medical care clearly are no more than disagreements with the medical judgment of the DOCS physicians about the particular modes of treatment and medical orders that were appropriate given his medical condition. Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). The mere fact that DOCS physicians in other facilities may have previously provided plaintiff with some of the treatments and accommodations he demanded at Mid-State does not render the medical decisions of Dr. Manava "deliberate indifference ." *See, e.g., Smith v. Woods,* 9:05-CV-1439 (LEK/DEP), 2008 WL 788573 at \*2, \*8, 2008 U.S. Dist. LEXIS 22191

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

(N.D.N.Y. March 20, 2008) (doctor's decision to prescribe Prozac to treat plaintiff's impulse control disorder was not an Eighth Amendment violation even though doctors in other institutions had prescribed Seroquel); *Ortiz v. Makram,* 96 Civ. 3285, 2000 WL 1876667 at *9-*10, 2000 U .S. Dist. LEXIS 18428 (S.D.N.Y. Dec.21, 2000) (primary prison doctor was not deliberately indifferent to an inmate patient's serious medical needs when, after reviewing the report of a consulting urologist who recommended Percocet, he made a medical judgment to prescribe a different pain killer).

Dr. Manava's decisions to treat plaintiff's arthritis with Naproxen, as opposed to other medications; [FN5] his conclusion that plaintiff did not require an MRI in light of the results of prior X-rays; [FN6] his recommendation of exercise, instead of ordering physical therapy; [FN7] his failure to provide plaintiff a back-brace; [FN8] and his decisions not to give plaintiff a "lower bunk" pass [FN9] or order other medical restrictions on plaintiff's work and other activities [FN10] were all medical judgments and did not deprive plaintiff of constitutionally adequate medical care. Similarly, Nurse Administrator Harris [FN11] and Dr. Ramineni, who each reviewed plaintiff's charts on one occasion in response to his complaints, and deferred to or confirmed Dr. Manava's treatment decisions, were clearly not deliberately indifferent to plaintiff's medical needs. Finally, Dr. Wright, who responded to plaintiff's complaints, directly or through subordinates, without personally reviewing or making medical decisions about plaintiff's condition, did not have sufficient direct involvement to be liable under Section 1983 even if a viable Eighth Amendment violation were alleged. [FN12]

FN5. *See, e.g., Veloz v. New York,* 339 F.Supp.2d at 525 (inmate's disagreement with his medical provider about whether he needed something stronger than Tylenol for his back pain did not constitute deliberate indifference to a serious medical need).

FN6. *See, e.g., Nelson v. Rodas,* 01CIV7887, 2002 WL 31075804 at *14-*15, 2002 U.S. Dist. LEXIS 17389 (S.D.N.Y. Sept.17, 2002) (citing cases) (inmate's complaint that the prison refused his request for a CAT scan and consultation with a specialist concerning his back spasms was not the proper basis for an Eighth Amendment claim).

FN7. *See, e.g., Morrison v. Mamis,* 08 Civ. 4302, 2008 WL 5451639 at *8, *10, 2008 U.S. Dist. Lexis 106416 (S.D.N.Y. Dec.18, 2008) (doctor refusing to prescribe physical therapy, switch prescription pain killers, or allow use of Ben Gay by an inmate complaining of back pain and migraines does not give rise to an deliberate indifference claim), Report and Recommendation adopted by 2009 WL 2168845, 2009 U.S. Dist. Lexis 61772 (S.D.N.Y. July 20, 2009).

FN8. *See, e. g., Evans v. Manos,* 336 F.Supp.2d 255, 262, 263 (W.D.N.Y.2004) (inmate's opinion that doctor should have prescribed something stronger than Advil and a back brace does not give rise to an issue of fact as to whether his constitutional rights were violated).

FN9. *See, e.g., Felix-Torres v. Graham,* No. 06-CV-1090, 2009 WL 3526644 at *8, 2009 U.S. Dist. LEXIS 98693 (N.D.N.Y. Oct. 23, 2009) (even negligently failing to assign an inmate to a lower bunk does not satisfy the subjective element of the deliberate indifference standard) (collecting cases).

FN10. *See, e.g., Estelle v. Gamble,* 429 U.S. at 100-101, 106-107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

FN11. The claims against defendant Harris would also be subject to dismissal because, as a nurse, she lacked the authority to override the medical decision of the treating prison physician. *See, e.g., Smith v. Woods,* 9:05-CV-1439 (LEK/DEP), 2008 WL 788573 at *9, 2008 U.S.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

Dist. LEXIS 22191 (N.D.N.Y. March 20, 2008) (social worker and psychologist in prison had no authority to override the decision of the treating psychiatrist regarding appropriate medication for an inmate/patient; further, they had no reason to know that the psychiatrist was not appropriately treating the plaintiff). See also *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate in not unreasonable, because they lack the authority to intervene in medical decisions).

FN12. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiff's letters of complaint to Defendant Wright and Commissioner Fischer are insufficient to establish personal involvement by the DOCS Chief Medical Officer, because he referred the matter to subordinates for decision and did not personally make any medical decisions regarding the plaintiff. *See, e.g. Gonzalez v. Wright,* 07-Civ-2898, 2009 WL 3149448 at *22-*23, 2009 U.S. Dist. LEXIS 91461 (S.D.N.Y. Sept.30, 2009) (DOCS Medical director not personally involved in alleged deprivation of adequate medical care by virtue of the fact that he received a complaint from plaintiff and delegated it to a subordinate for response) (*citing Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS commissioner was not personally involved in alleged constitutional violation where he only referred plaintiff's complaint to a subordinate for decision)). Even if Dr. Wright or other DOCS officials had ignored some of plaintiff's complaints, it would not make them liable under Section 1983 for the alleged constitutional violations. *See, e.g., Greenwaldt v. Coughlin,* No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4, 1995 U.S. Dist. LEXIS 5144 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request

for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations .").

**C. Patients' Bill of Rights and Americans with Disabilities Act**

In his complaint, plaintiff makes passing references to violations of his rights under the Patients' Bill of Rights and the "Disability Act," presumably the Americans with Disabilities Act ("ADA"). The Patients' Bill of Rights was created by New York state law, N.Y. Public Health Law § 2803(1)(g), and a violation of state law would not implicate a federal right supporting a claim under Section 1983. *See, e.g., Fox v. Brown,* 9:05-Cv-1292 (LEK/GJD), 2007 WL 586723 at *9, n. 5, Report-Recommendation adopted at 2007 U.S. Dist. LEXIS 11876 (N.D.N.Y. Feb. 21, 2007); *Parker v. DeBuono,* 98 Civ. 5765, 2000 WL 223841 at *2, 2000 U.S. Dist. LEXIS 2131 (S.D.N.Y. Feb.25, 2000). For the reasons set forth below, plaintiff also fails to state a viable claim under the ADA.

**\*7** The ADA is applicable to inmates in state correctional facilities. *See Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005) (both the ADA and the Rehabilitation Act are applicable to inmates). Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005).

In order to establish a claim under the ADA, the plaintiff must first show that he has a disability. *Farid v. Bouey,* 554 F.Supp.2d 301, 326 (N.D.N.Y.2008). Under the Title II of the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities. *Id.* (citing *inter alia Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 147 (2d Cir.2002); *Doe v. Goord,* No. 04-CV-570, 2004 WL 2829876 at *17, 2004 U.S. Dist. LEXIS 24808 (S.D.N.Y. Dec. 10, 2004); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B)). Plaintiff must identify the activity that he claims is impaired and establish that it constitutes a "major life activity." *Weixel,* 287 F.3d at 147.

Major life activities include, among others, caring for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

oneself; performing manual tasks; seeing, hearing; speaking; breathing; learning; reading; communicating; and working. 42 U.S.C. § 12101(2)(A). Major life activities also include the operation of a major bodily function such as the immune system; digestive system; neurological system; respiratory; bladder; brain; endocrine; reproductive and circulatory systems. *Id.* § 12101(2)(B). Plaintiff in this case has not specifically identified a disability, nor has he identified a "major life activity" that he claims has been "substantially limited." A substantial limitation is one that prevents or severely restricts the individual from doing activities that are of "central importance most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184,198 (2002).[FN13]

> FN13. The court notes that amendments to the ADA, that took effect January 1, 2009 broadened the scope of the definition of disability, partially superceding *Toyota Mfg. See Guary v. Upstate Nat'l Bank,* 618 F.Supp.2d 272, 275 n. 1 (W.D.N.Y.2009) (citing ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 3553 (2008)). However, it has been held that these amendments do not apply retroactively; thus, they do not affect this Court's recommendation.

Plaintiff has osteoarthritis in his lower back. He failed to identify either any major life activity that was substantially limited by this impairments or any activity or program in which he could not participate. Nor did he allege what accommodation would have allowed him to participate in such a program. Thus, plaintiff's passing reference to the ADA does not state any claim for relief under that statute.

**D. Qualified Immunity**

Defendant has invoked qualified immunity with respect to the plaintiff's claim for deliberate indifference to his serious medical needs under the Eighth Amendment, arguing that no such constitutional violation was established. Given that this court has recommended that the defendants' motion to dismiss be granted, the qualified immunity argument need not be addressed.

**\*8 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss under FED.R.CIV.P. 12(b)(6) (Dkt. No. 21) be GRANTED and the complaint be dismissed, without prejudice, in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Gillespie v. New York State Dept. of Correctional Services
Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED   that   the   Report-Recommendation   is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

    FN1. This matter was referred to the undersigned
    pursuant   to   28   U.S.C.   §   636(b)   and
    N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that* there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Anthony GILLESPIE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, et al., Defendants.
No. 9:08-CV-1339 (TJM/ATB).

Feb. 22, 2010.

Anthony Gillespie, pro se.

Michael McCartin, AAG, for Defendant.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge. The case was recently re-assigned from Magistrate Judge George H. Lowe to this court.

In this civil rights complaint, plaintiff alleges that four individual defendants employed by the New York State Department of Correctional Services ("DOCS") denied him adequate medical care, in violation of the Eighth Amendment, while plaintiff was an inmate in the custody of the Mid-State Correctional Facility ("Mid-State") in 2008. (Dkt. No. 1). The complaint also makes passing references to the alleged violation of his rights under the "Patient's Bill of Rights" and the "Disability Act." Plaintiff seeks substantial monetary damages and other relief.

Presently before this court is the defendants's motion to dismiss the complaint for failure to state a viable claim, pursuant to FED.R.CIV.P. 12(b)(6). (Dkt. No. 21).

Plaintiff filed a responsive affidavit and memorandum of law. (Dkt. No. 27). For the following reasons, this court recommends that the plaintiff's complaint be dismissed, without prejudice, in its entirety.

**DISCUSSION**

**I.** *Facts and Procedural History*

Plaintiff was transferred to Mid-State in early April 2008.FN1 On April 24, 2008, plaintiff saw defendant Manava, a DOCS physician at Mid-State, and complained of lower back pain due to osteoarthritis. Plaintiff requested certain modes of treatment and medical orders that he had received at various prior times in other DOCS facilities-a "back brace," physical therapy, a permit for no lifting of over 25 pounds, no sitting for over 25 minutes, bottom bunk permit, light duty," and an outside consultation for an MRI. (Complaint ¶¶ 14-16). Dr. Manava examined plaintiff and observed that he had no trouble walking, bending, or doing daily chores and that he had no deformity or prior injury. Dr. Manava referred to prior X-rays of plaintiff and concluded that an MRI was not required. He also determined that plaintiff did not meet the requirements for assignment to a bottom bunk.FN2 Dr. Manava continued plaintiff's prescription for Naproxen and recommended that he do stretching exercises. (Ex. A, Dkt. No. 1-2 at 2).

> FN1. Plaintiff referenced in his complaint attached DOCS Ambulatory Health Records ("AHRs") and other DOCS medical records, as well as documentation of his extensive complaints and grievances to DOCS regarding his medical care in 2008. (Exs.A-P, Dkt. No. 1-2). These exhibits to the complaint are referenced in outlining the facts set forth herein.

> FN2. In various attachments to the complaint, plaintiff attempts to document that Dr. Manava's denial of a bottom bunk restriction was contrary to DOCS Health Care Services Policy No. 1.49, which includes, among the criteria for placement in a lower bunk, a "permanent physical disability, ... *e.g.* rheumatoid arthritis." (Ex. A,

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

Dkt. No. 1-2 at 4; Ex. C, Dkt. No. 1-2 at 21-22). While it is unnecessary to discuss the differences between these two forms of arthritis in connection with this motion, it is commonly understood that they are significantly different conditions and that rheumatoid arthritis is typically more disabling than osteoarthritis. *See, e.g.,* MedLinePlus website, a service of the U.S. National Library of Medicine and the National Institutes of Health: http://www.nlm.nih.gov/medlineplus/ency/article/000431.htm (rheumatoid arthritis) and http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm (osteoarthritis).

Over the next three months, plaintiff wrote a series of complaints and formal grievances [FN3] to various DOCS officials complaining of Dr. Manava's failure to order the types of treatment and accommodations that he had previously enjoyed at other DOCS facilities. On April 24, 2008, plaintiff wrote a letter to defendant Harris, a Nurse Administrator at Mid-State, who replied, the next day, that she could not override the medical decisions of a treating physician. (Complaint ¶ 18-19; Ex. C, Dkt. No. 1-2 at 21-23).

FN3. The court will discuss the various letters to named defendants which form the bases for plaintiff's allegations that they violated his Eighth Amendment rights. It is not necessary to detail the several formal grievances which the plaintiff also submitted during the same time period in 2008. Defendants' motion does not assert that the plaintiff failed to exhaust his administrative remedies; and plaintiff documents that he pursued and appealed formal grievances. In response to the grievances, DOCS consistently upheld the decisions of its medical staff, but did recommend that plaintiff continue to pursue his medical issues through sick call at the facility. DOCS also offered plaintiff the option to seek an outside medical opinion at his own expense. (Complaint, ¶¶ 20, 24-27, 36; Exs. D, G-H, O-P)

On May 8, 2008, plaintiff sent a letter of complaint about Dr. Manava and Nurse Administrator Harris to

defendant Ramineni, the Facilities Health Services Director at Mid-State, but received no reply. (Complaint ¶ 21; Ex. E, Dkt. No. 1-2 at 32-34). Plaintiff penned another letter on May 18th to Dr. Ramineni, who replied two days later, stating that he had reviewed the plaintiff's chart and determined there was no medical basis for plaintiff's various requests for particular modes of treatment. (Complaint ¶¶ 22-23; Ex. F, Dkt. No. 1-2 at 36-37). On May 21, 2008, plaintiff wrote a short note to Dr. Ramineni, asking him to reconsider his prior decision, to which no reply was received. (Ex. F, Dkt. No. 1-2 at 38).

**\*2** On June 3, 2009, plaintiff wrote a letter repeating the complaints about his medical treatment at Mid-State to defendant Wright, the Chief Medical Officer of DOCS. (Complaint ¶ 28; Ex. I, Dkt. No. 1-2 at 49-51). Dr. Wright referred the letter to Regional Health Services Administrator ("RHSA") Pedro Diaz. By letter dated June 11th, RHSA Diaz summarized the course of plaintiff's prior treatment, advised that the facility physician was the final arbiter of medical decisions regarding plaintiff's care, and concluded that plaintiff's allegation that his health care needs were not being met were unsubstantiated. (Complaint ¶ 29; Ex. J, Dkt. No. 1-2 at 54). Plaintiff directed his next letter of complaint to Brian Fischer, the DOCS Commissioner who is not named in this action. Commissioner Fischer referred the letter to Dr. Wright who responded using language similar to the prior letter of RHSA Diaz. (Complaint ¶¶ 30-31; Ex. K & I, Dkt. No. 1-2 at 55-59). Dr. Wright and his staff repeatedly urged the plaintiff to address his health care issues using existing sick call procedures at the facility.

On July 22, 2008, plaintiff was again examined at Mid-State by Dr. Manava. The complaint alleges that plaintiff again mentioned his lower-back arthritis and complained that Naproxen was not helping meet "his medical needs." Plaintiff claims that Dr. Manava found nothing wrong with plaintiff's back and denied his requests for assistance. (Complaint ¶¶ 34-35). The AHR attached to the complaint reflects that the plaintiff complained of lower back pain and stiffness and stated that he had run out of Naproxen. Dr. Manava noted that plaintiff's prior X-rays confirmed mild degenerative osteoarthritis, but were otherwise normal. His examination indicated that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

plaintiff had no deformity and a full range of motion. He refilled plaintiff's Naproxen prescription and suggested that he use certain exercises and hot water showers to help address his symptoms. (Ex. B, Dkt. No. 1-2 at 14). Although not referenced in the complaint, the attached medical records indicate that plaintiff was also seen by the medical staff at Mid-State regarding his back and other health issues twice in August 2008. (Ex. B, Dkt. No. 1-2 at 14-15).

Plaintiff filed his complaint on December 12, 2008, naming the four defendants referenced above, as well as DOCS and "John/Jane Does 1-50 (DOCS) supervisory, training and policy personnel." The District Court denied plaintiff's request for class certification, dismissed DOCS as a defendant, and directed plaintiff to take reasonable steps to identify the John/Jane Doe Defendants. (Dkt. Nos.4, 6). Ultimately, the plaintiff advised that he intended to proceed only against the four originally-named individual defendants, and the District Court dismissed the action against all other defendants. (Dkt.Nos.16, 18).

The complaint appears to name defendants Wright, Harris, Ramineni, and Manava in both their official and individual capacities, and this court recommends that the action be dismissed to the extent it purports to sue these defendants in their official capacities for damages.[FN4] The complaint will be evaluated assuming that it makes claims against the DOCS defendants only in their individual capacities.

FN4. It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted). To the extent that the DOCS defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson,* 251 F.3d 65, 69-70 (2d Cir.2001); *Posr v. Court Officer*

*Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

## II. *Motion to Dismiss*

**\*3** Defendants move to dismiss the complaint, arguing (1) that plaintiff cannot establish an Eighth Amendment claim because he cannot show that he suffered from a "serious" medical condition and because he is alleging mere disagreement with the medical judgment of DOCS physicians regarding appropriate treatment; (2) that Nurse Administrator Harris's deference to the medical decision of a prison physician cannot constitute "deliberate indifference"; (3) that defendants Wright and Ramineni were not personally involved in plaintiff's medical care and cannot be liable under Section 1983; and (4) that all of the defendants are entitled to qualified immunity. This court concludes that plaintiff has failed to allege a viable claim that his disagreement with the medical decisions of DOCS physicians constituted deliberate indifference to his medical needs. The complaint's passing reference to the Patients' Bill of Rights and the Americans with Disability Act also do not state a claim upon which relief can be granted. Accordingly, this court recommends that the complaint be dismissed in its entirety, without prejudice.

## A. Legal Standard for Motion to Dismiss

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp., 550 U.S. at 555).* Plaintiff's factual allegations must also be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, in the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted). In this case, plaintiff has attached various exhibits to the complaint that the court has considered in making its ruling on defendants' motion.

**B. Inadequate Medical Care**

**1. Legal Standards**

**\*4** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

**a. Objective Element**

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . (citing *Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases where the alleged inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

**b. Subjective Element**

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

*\*5* In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.* Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**2. Application of Legal Standards**

Defendants argue that plaintiff has failed to allege that he suffered from a sufficiently "serious" medical condition to satisfy the objective element of the Eighth Amendment

standards for medical care. Noticeably missing in plaintiff's complaint are any factual allegations indicating that his degenerative osteoarthritis of his lower back constituted a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996). The medical records attached to the complaint document that, over a period of three years, plaintiff periodically claimed to suffer pain, variously described as "intermittent," "chronic," "increasing"; but he only once used the term "severe" and never used other adjectives such as "extreme," "excruciating," or "unbearable." (Dkt. No. 1-2 at 8-15, 34, 42). It is extremely questionable that plaintiff has alleged a medical condition that is sufficiently serious for the purposes of the Eighth Amendment. *See, e.g., Veloz v. New York,* 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *Taylor v. Kurtz,* 00-CV-0700, 2004 WL 2414847 at *2, *3-*4, 2004 U.S. Dist. LEXIS 27925 (W.D.N.Y. Oct.28, 2004) (prisoner's degenerative arthritic knee condition did not constitute a serious medical need); *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Phillips v. Goord,* 08-CV-0957, 2009 WL 909593 at *6, 2009 U.S. Dist. LEXIS 29322 (W.D.N.Y. Apr.1, 2009) (allegations of "chronic" back pain do not support a claim that plaintiff had a "serious" medical condition).

*\*6* In any event, plaintiff's complaints about his medical care clearly are no more than disagreements with the medical judgment of the DOCS physicians about the particular modes of treatment and medical orders that were appropriate given his medical condition. Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). The mere fact that DOCS physicians in other facilities may have previously provided plaintiff with some of the treatments and accommodations he demanded at Mid-State does not render the medical decisions of Dr. Manava "deliberate indifference ." *See, e.g., Smith v. Woods,* 9:05-CV-1439 (LEK/DEP), 2008 WL 788573 at *2, *8, 2008 U.S. Dist. LEXIS 22191

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

(N.D.N.Y. March 20, 2008) (doctor's decision to prescribe Prozac to treat plaintiff's impulse control disorder was not an Eighth Amendment violation even though doctors in other institutions had prescribed Seroquel); *Ortiz v. Makram,* 96 Civ. 3285, 2000 WL 1876667 at *9–*10, 2000 U .S. Dist. LEXIS 18428 (S.D.N.Y. Dec.21, 2000) (primary prison doctor was not deliberately indifferent to an inmate patient's serious medical needs when, after reviewing the report of a consulting urologist who recommended Percocet, he made a medical judgment to prescribe a different pain killer).

Dr. Manava's decisions to treat plaintiff's arthritis with Naproxen, as opposed to other medications; [FN5] his conclusion that plaintiff did not require an MRI in light of the results of prior X-rays; [FN6] his recommendation of exercise, instead of ordering physical therapy; [FN7] his failure to provide plaintiff a back-brace; [FN8] and his decisions not to give plaintiff a "lower bunk" pass [FN9] or order other medical restrictions on plaintiff's work and other activities [FN10] were all medical judgments and did not deprive plaintiff of constitutionally adequate medical care. Similarly, Nurse Administrator Harris [FN11] and Dr. Ramineni, who each reviewed plaintiff's charts on one occasion in response to his complaints, and deferred to or confirmed Dr. Manava's treatment decisions, were clearly not deliberately indifferent to plaintiff's medical needs. Finally, Dr. Wright, who responded to plaintiff's complaints, directly or through subordinates, without personally reviewing or making medical decisions about plaintiff's condition, did not have sufficient direct involvement to be liable under Section 1983 even if a viable Eighth Amendment violation were alleged. [FN12]

FN5. *See, e.g., Veloz v. New York,* 339 F.Supp.2d at 525 (inmate's disagreement with his medical provider about whether he needed something stronger than Tylenol for his back pain did not constitute deliberate indifference to a serious medical need).

FN6. *See, e.g., Nelson v. Rodas,* 01CIV7887, 2002 WL 31075804 at *14–*15, 2002 U.S. Dist. LEXIS 17389 (S.D.N.Y. Sept.17, 2002) (citing cases) (inmate's complaint that the prison refused his request for a CAT scan and consultation with a specialist concerning his back spasms was not the proper basis for an Eighth Amendment claim).

FN7. *See, e.g., Morrison v. Mamis,* 08 Civ. 4302, 2008 WL 5451639 at *8, *10, 2008 U.S. Dist. Lexis 106416 (S.D.N.Y. Dec.18, 2008) (doctor refusing to prescribe physical therapy, switch prescription pain killers, or allow use of Ben Gay by an inmate complaining of back pain and migraines does not give rise to an deliberate indifference claim), Report and Recommendation adopted by 2009 WL 2168845, 2009 U.S. Dist. Lexis 61772 (S.D.N.Y. July 20, 2009).

FN8. *See, e. g., Evans v. Manos,* 336 F.Supp.2d 255, 262, 263 (W.D.N.Y.2004) (inmate's opinion that doctor should have prescribed something stronger than Advil and a back brace does not give rise to an issue of fact as to whether his constitutional rights were violated).

FN9. *See, e.g., Felix-Torres v. Graham,* No. 06-CV-1090, 2009 WL 3526644 at *8, 2009 U.S. Dist. LEXIS 98693 (N.D.N.Y. Oct. 23, 2009) (even negligently failing to assign an inmate to a lower bunk does not satisfy the subjective element of the deliberate indifference standard) (collecting cases).

FN10. *See, e.g., Estelle v. Gamble,* 429 U.S. at 100-101, 106-107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

FN11. The claims against defendant Harris would also be subject to dismissal because, as a nurse, she lacked the authority to override the medical decision of the treating prison physician. *See, e.g., Smith v. Woods,* 9:05-CV-1439 (LEK/DEP), 2008 WL 788573 at *9, 2008 U.S.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

Dist. LEXIS 22191 (N.D.N.Y. March 20, 2008) (social worker and psychologist in prison had no authority to override the decision of the treating psychiatrist regarding appropriate medication for an inmate/patient; further, they had no reason to know that the psychiatrist was not appropriately treating the plaintiff). See also *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate in not unreasonable, because they lack the authority to intervene in medical decisions).

FN12. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiff's letters of complaint to Defendant Wright and Commissioner Fischer are insufficient to establish personal involvement by the DOCS Chief Medical Officer, because he referred the matter to subordinates for decision and did not personally make any medical decisions regarding the plaintiff. *See, e.g. Gonzalez v. Wright,* 07-Civ-2898, 2009 WL 3149448 at *22-*23, 2009 U.S. Dist. LEXIS 91461 (S.D.N.Y. Sept.30, 2009) (DOCS Medical director not personally involved in alleged deprivation of adequate medical care by virtue of the fact that he received a complaint from plaintiff and delegated it to a subordinate for response) (*citing Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS commissioner was not personally involved in alleged constitutional violation where he only referred plaintiff's complaint to a subordinate for decision)). Even if Dr. Wright or other DOCS officials had ignored some of plaintiff's complaints, it would not make them liable under Section 1983 for the alleged constitutional violations. *See, e.g., Greenwaldt v. Coughlin,* No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4, 1995 U.S. Dist. LEXIS 5144 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request

for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations .").

**C. Patients' Bill of Rights and Americans with Disabilities Act**

In his complaint, plaintiff makes passing references to violations of his rights under the Patients' Bill of Rights and the "Disability Act," presumably the Americans with Disabilities Act ("ADA"). The Patients' Bill of Rights was created by New York state law, N.Y. Public Health Law § 2803(1)(g), and a violation of state law would not implicate a federal right supporting a claim under Section 1983. *See, e.g., Fox v. Brown,* 9:05-Cv-1292 (LEK/GJD), 2007 WL 586723 at *9, n. 5, Report-Recommendation adopted at 2007 U.S. Dist. LEXIS 11876 (N.D.N.Y. Feb. 21, 2007); *Parker v. DeBuono,* 98 Civ. 5765, 2000 WL 223841 at *2, 2000 U.S. Dist. LEXIS 2131 (S.D.N.Y. Feb.25, 2000). For the reasons set forth below, plaintiff also fails to state a viable claim under the ADA.

**\*7** The ADA is applicable to inmates in state correctional facilities. *See Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005) (both the ADA and the Rehabilitation Act are applicable to inmates). Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005).

In order to establish a claim under the ADA, the plaintiff must first show that he has a disability. *Farid v. Bouey,* 554 F.Supp.2d 301, 326 (N.D.N.Y.2008). Under the Title II of the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities. *Id.* (citing *inter alia Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 147 (2d Cir.2002); *Doe v. Goord,* No. 04-CV-570, 2004 WL 2829876 at *17, 2004 U.S. Dist. LEXIS 24808 (S.D.N.Y. Dec. 10, 2004); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B)). Plaintiff must identify the activity that he claims is impaired and establish that it constitutes a "major life activity." *Weixel,* 287 F.3d at 147.

Major life activities include, among others, caring for

Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)

(Cite as: 2010 WL 1006634 (N.D.N.Y.))

oneself; performing manual tasks; seeing, hearing; speaking; breathing; learning; reading; communicating; and working. 42 U.S.C. § 12101(2)(A). Major life activities also include the operation of a major bodily function such as the immune system; digestive system; neurological system; respiratory; bladder; brain; endocrine; reproductive and circulatory systems. *Id.* § 12101(2)(B). Plaintiff in this case has not specifically identified a disability, nor has he identified a "major life activity" that he claims has been "substantially limited." A substantial limitation is one that prevents or severely restricts the individual from doing activities that are of "central importance most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184,198 (2002).[FN13]

> [FN13.] The court notes that amendments to the ADA, that took effect January 1, 2009 broadened the scope of the definition of disability, partially superceding *Toyota Mfg. See Guary v. Upstate Nat'l Bank,* 618 F.Supp.2d 272, 275 n. 1 (W.D.N.Y.2009) (citing ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 3553 (2008)). However, it has been held that these amendments do not apply retroactively; thus, they do not affect this Court's recommendation.

Plaintiff has osteoarthritis in his lower back. He failed to identify either any major life activity that was substantially limited by this impairments or any activity or program in which he could not participate. Nor did he allege what accommodation would have allowed him to participate in such a program. Thus, plaintiff's passing reference to the ADA does not state any claim for relief under that statute.

**D. Qualified Immunity**

Defendant has invoked qualified immunity with respect to the plaintiff's claim for deliberate indifference to his serious medical needs under the Eighth Amendment, arguing that no such constitutional violation was established. Given that this court has recommended that the defendants' motion to dismiss be granted, the qualified immunity argument need not be addressed.

**\*8 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss under FED.R.CIV.P. 12(b)(6) (Dkt. No. 21) be GRANTED and the complaint be dismissed, without prejudice, in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Gillespie v. New York State Dept. of Correctional Services
Not Reported in F.Supp.2d, 2010 WL 1006634 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.